[This decision has been published in *Ohio Official Reports* at 92 Ohio St.3d 354.]

BUTLER, APPELLEE, *v.* JORDAN ET AL.; CUYAHOGA COUNTY DEPARTMENT OF
HUMAN SERVICES, APPELLANT.

[Cite as *Butler v. Jordan*, 2001-Ohio-204.]

*Political subdivision tort liability—Within meaning of R.C. 2744.02(B)(5), R.C.
5104.11 does not expressly impose liability on a political subdivision for
failure to inspect or for the negligent certification of a type-B family day-
care home—Within meaning of R.C. 2744.02(B)(5), no other section of the
Revised Code imposes liability on a political subdivision for failure to
inspect or for the negligent certification of a type-B family day-care home.*

(No. 99-1816—Submitted September 12, 2000—Decided July 25, 2001.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 74509.

———————————

SYLLABUS OF THE COURT

1.  Within the meaning of R.C. 2744.02(B)(5), R.C. 5104.11 does not expressly
impose liability on a political subdivision for failure to inspect or for the
negligent certification of a type-B family day-care home even where the
political subdivision has completely ignored the obligations imposed upon
it by the statute.

2.  Within the meaning of R.C. 2744.02(B)(5), no other section of the Revised Code
expressly imposes liability on a political subdivision for failure to inspect
or for the negligent certification of a type-B family day-care home.

———————————

DOUGLAS, J.

{¶ 1} According to appellee's complaint, Geraldine Jordan was the operator
and primary care giver at Guardian Angel Day Care ("Guardian Angel"). Guardian

Angel was a type-B day-care home certified by the Cuyahoga County Department of Human Services ("CCDHS").[1]

{¶ 2} On the morning of April 6, 1995, Venisha Butler, appellee, placed her eight-month-old son, Aaron, and two-year-old son, Sam, in the care of Jordan and Guardian Angel. At approximately 3:15 p.m., that same day, Butler returned to Guardian Angel to pick up her children. When Jordan brought Aaron out to his mother, Aaron was not breathing and his body was cold. Butler noticed that there was a sticky substance around Aaron's nose and mouth. When Aaron failed to respond to CPR, an ambulance was called. Aaron could not be revived and was pronounced dead on arrival at University Hospitals Rainbow Babies and Children's Hospital. The sticky substance on Aaron's face was the residue of tape that had been placed over Aaron's nose and mouth.

{¶ 3} On January 22, 1997, Butler filed a complaint in the Common Pleas Court of Cuyahoga County, naming Jordan, Guardian Angel, and CCDHS as defendants. The complaint alleged that CCDHS, appellant, was negligent and/or reckless in the licensing and certification of Guardian Angel, and that its negligence or recklessness was the proximate cause of Aaron's death. On May 16, 1997, CCDHS filed a Civ.R. 12(B)(6) motion to dismiss Butler's claims. CCDHS contended that it was immune from civil liability pursuant to R.C. 2744.02. On April 15, 1998, the trial court granted CCDHS's motion to dismiss. Butler appealed.

{¶ 4} The Court of Appeals for Cuyahoga County reversed the judgment of the trial court. The court of appeals held that R.C. 5104.11 imposed a duty upon

---

1. R.C. 5104.01(RR) (formerly [E]) defines "type B family day-care home" and "type B home" as "a permanent residence of the provider in which child day-care is provided for one to six children at one time and in which no more than three children are under two years of age at one time."

appellant to inspect and license[2] type-B day-care homes and that the failure to carry out that duty qualified as an exception to immunity under R.C. 2744.02(B)(5). The case is now before this court upon our allowance of a discretionary appeal.

## R.C. Chapter 5104

{¶ **5**} R.C. Chapter 5104 provides the procedures for licensing, inspecting, and certifying publicly funded child day-care centers, type-A day-care homes, and type-B family day-care homes. Each facility has its own certification procedures. In the case of type-B family day-care homes, R.C. 5104.11(A) required a county department of human services, not the state, to inspect and certify type-B family day-care homes.

{¶ **6**} Former R.C. 5104.11(A) provided:

"[A]fter receipt of an application for certification from a type-B family day-care home, the county director of human services *shall* inspect and, if it complies with this chapter and any applicable rules adopted under this chapter, certify the type-B family day-care home to provide publicly funded child day-care pursuant to this chapter and any rules adopted under it." (Emphasis added.) Sub.H.B. No. 155, 144 Ohio Laws, Part III, 3317.

{¶ **7**} Former R.C. 5104.013(A)(2) provided:

"The director of a county department of human services, as part of the process of certification of type-B family day-care homes, *shall* request the superintendent of the bureau of criminal identification and investigation to conduct a criminal records check with respect to any authorized provider of a certified type-B family day-care home and any person eighteen years of age or older who resides

---

2. More properly the duty to inspect and certify. R.C. 5104.11 required the county director of human services to inspect and certify type-B family day-care homes. It is the Ohio Department of Job and Family Services that *licenses* day-care homes pursuant to R.C. 5104.03.

in a certified type-B family day-care home."[3] (Emphasis added.) Am.Sub.H.B. No. 687, 145 Ohio Laws, Part IV, 6949.

{¶ 8} Butler alleged in her complaint that CCDHS "was negligent and/or reckless in licensing and certifying Defendant Guardian Angel to provide day care services to infants." In support of her complaint, Butler argues that Guardian Angel was a certified type-B family day-care home subject to inspections by CCDHS and that CCDHS failed to perform the mandatory criminal background checks on Guardian Angel's day-care providers.[4]

R.C. Chapter 2744

{¶ 9} R.C. 2744.02(A)(1) provides immunity to political subdivisions and their employees for torts caused by any act or omission of a political subdivision or its employee. R.C. 2744.02(B) sets forth exceptions to that grant of immunity. Specifically, R.C. 2744.02(B)(5) provides:

"In addition to the circumstances described in divisions (B)(1) to (4) of this section, a political subdivision is liable for injury, death, or loss to persons or property when liability is expressly imposed upon the political subdivision by a section of the Revised Code * * *. Liability shall not be construed to exist under another section of the Revised Code merely because a responsibility is imposed

---

3. In R.C. 5104.11(A) and 5104.013(A)(2), the county director of human services is now designated as the "county director of job and family services" or the "director of a county department of job and family services." There have been no other substantive changes in the quoted portions of the statutes.

4. In this case, Butler alleges that CCDHS "was negligent and/or reckless in licensing and certifying Defendant Guardian Angel to provide day care services to infants." In her response to CCDHS's motion to dismiss, Butler expanded on some of her allegations of negligence against CCDHS. Among allegations discussed in her response to CCDHS's motion to dismiss, Butler claims that CCDHS failed to perform mandatory background checks on Guardian Angel's employees. A review of a motion to dismiss pursuant to Civ.R. 12(B)(6) assumes all the allegations of the complaint to be true and is confined to the pleadings. Nevertheless, it is appropriate to consider explanations in Butler's response to CCDHS's motion to dismiss in order to interpret the allegations of the complaint.

upon a political subdivision or because of a general authorization that a political subdivision may sue and be sued."

{¶ 10} Appellant argues that within the meaning of R.C. 2744.02(B)(5), R.C. 5104.11 does not expressly impose liability upon a political subdivision for failure to inspect and for negligent certification of type-B family homes. We agree.

{¶ 11} In order to determine the immunity of a political subdivision pursuant to the Political Subdivision Tort Liability Act, a three-tiered analysis of R.C. Chapter 2744 is required. We set forth that analysis in *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 28, 697 N.E.2d 610, 614, and in *Campbell v. Burton* (2001), 92 Ohio St.3d 336, ___ N.E.2d ___. We will not repeat that discussion here. After applying the three-tiered analysis we hold that the exception to political subdivision immunity found in R.C. 2744.02(B)(5) does not apply.

{¶ 12} Within the meaning of R.C. 2744.02(B)(5), the term "liability" refers to either criminal or civil liability. *Campbell v. Burton*, *supra*. However, unlike R.C. Chapter 2151, which we reviewed in *Campbell*, R.C. Chapter 5104 provides no penalties for violation of statutory duties. R.C. 5104.99 does impose penalties for violations of R.C. 5104.02, 5104.09(B), and 5104.09(C), but none of these sections deals with the duty of a political subdivision to inspect or certify a type-B family day-care home. Accordingly, we hold that within the meaning of R.C. 2744.02(B)(5), R.C. 5104.11 does not expressly impose liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home even where the political subdivision has completely ignored the obligations imposed upon it by the statute. Further, after an extensive review of pertinent sections of the Revised Code, we also find that within the meaning of R.C. 2744.02(B)(5), no other section of the Revised Code expressly imposes liability on a political subdivision for failure to inspect or for the negligent certification of a type-B family day-care home.

{¶ 13} Appellee, like the court of appeals, relies upon *Globe Am. Cas. Co. v. Cleveland* (1994), 99 Ohio App.3d 674, 679, 651 N.E.2d 1015, 1018, to support the proposition that a statute, by imposing an express duty, also imposes express liability. However, R.C. 2744.02(B)(5) specifically provides to the contrary. "Expressly" means "in direct or unmistakable terms: in an express manner: *explicitly, definitely, directly*." (Emphasis added.) Webster's Third New International Dictionary (1986) 803. Clearly, neither R.C. 5104.11 nor 5104.99, nor any other section of the Revised Code, expressly imposes liability upon a political subdivision for failure to inspect or for negligent certification of a type-B family day-care home. Accordingly, based upon R.C. 2744.02(B)(5), strange as it may seem, CCDHS is immune from liability for failure to inspect or for the negligent certification of a type-B family day-care home because there is no statute expressly imposing liability.

{¶ 14} The tragedy of this case is that appellant is able to shuck its clear duties and responsibilities, as are other political subdivisions, on the sole basis of the doctrine of sovereign immunity. What is this doctrine that permits the government to injure its citizens with impunity? How can a government be immune from liability for an act for which that same government would impose liability upon one of its citizens? The answer is that "government," whoever that may be, has accorded itself the right to negligently injure its citizens with immunity, all in disregard of constitutional protections reserved by its citizens to themselves.

The Doctrine of Sovereign Immunity

{¶ 15} Appellee did not raise the constitutionality of R.C. Chapter 2744 generally or R.C. 2744.02(B)(5) specifically in the courts below. Appellee does, at footnote two of her brief here, urge the court to consider the constitutionality of R.C. 2744.02(B)(5). Such a reference is not the procedurally proper way to raise the constitutionality of a statute. See *Cicco v. Stockmaster* (2000), 89 Ohio St.3d 95, 728 N.E.2d 1066, and R.C. 2721.12.

**{¶ 16}** However, given the allegations of this case, that a child was placed in the care of a person and her facility, that the facility was to be inspected and approved by the Cuyahoga County Department of Human Services, that the background of the care givers was to be checked, that the political subdivision entirely failed to comply with these statutory mandates before the facility was certified, and that when returned to his mother at the end of the work day, the child was dead, having been smothered with duct tape, it does seem that serious questions arise. This is especially true given the allegation that even though the political subdivision entirely failed to carry out its statutorily mandated duties, the political subdivision is found not to be liable, on the basis that it pleads that it is immune, pursuant to the doctrine of sovereign immunity. It does, indeed, seem fair to ask, "How can this be the law?"

### History

**{¶ 17}** The history of sovereign immunity and how we find ourselves where we do in Ohio today is most interesting. The history of the doctrine in this country is associated with the English common-law concept that "the king can do no wrong." See *Haas v. Hayslip* (1977), 51 Ohio St.2d 135, 140, 5 O.O.3d 110, 113, 364 N.E.2d 1376, 1379 (William B. Brown, J., dissenting).[5] That concept evolved from the personal prerogatives of the King of England, who was considered the fount of justice and equity in the English common-law. In the English feudal system, the lord of the manor was not subject to suit in his own courts. See 1 Pollock & Maitland, The History of English Law Before the Time of Edward I (2 Ed.1968) 518. The king, as highest feudal lord, enjoyed this protection on the theory that no court was above him. *Id.* Further, the king was considered the supreme power and was, thus, infallible. His person was considered sacred, and the law ascribed to him the attribute of sovereignty. Therefore, it was his personal

---

5. *Haas v. Hayslip* (1977), 51 Ohio St.2d 135, 5 O.O.3d 110, 364 N.E.2d 1376, was overruled by *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749.

royal prerogative not to be subjected to suit in his own courts. See, generally, Borchard, Government Liability in Tort (1924), 34 Yale L.J. 1, 4. Accordingly, the king could do no wrong.

{¶ 18} Although the notion of sovereign immunity is best suited to a government of royal power, American courts nonetheless accepted the doctrine in the early days of the republic. See Prosser & Keeton, Law of Torts (5 Ed.1984) 1033. However, courts and commentators have remained mystified *why* the doctrine was ever accepted in this country. Borchard expressed his bafflement this way:

"Nothing seems more clear than that this immunity of the King from the jurisdiction of the King's courts was purely personal. How it came to be applied in the United States of America, where the [royal] prerogative is unknown, is one of the mysteries of legal evolution. Admitting its application to the sovereign and its illogical ascription as an attribute of sovereignty generally, it is not easy to appreciate its application to the United States, where the location of sovereignty— undivided sovereignty, as orthodox theory demands—is a difficult undertaking. It is beyond doubt that the Executive in the United States is not historically the sovereign, and the legislature, which is perhaps the depository of the widest powers, is restrained by constitutional limitations. The federal government is one of delegated powers and the states are not sovereign, according to the Constitution, as demonstrated forcibly by the Civil War and the resulting Amendments. That brings us to the only remaining alternative, that sovereignty resides in the American electorate or the people." (Footnotes omitted.) Borchard, Government Liability in Tort, 34 Yale L.J. at 4-5. See, also, *Muskopf v. Corning Hosp. Dist.* (1961), 55 Cal.2d 211, 214-216, 11 Cal.Rptr. 89, 90-92, 359 P.2d 457, 458-460.

{¶ 19} Indeed, the Declaration of Independence is an expression of why this country chose to sever ties with English rule. In the strongest terms the forefathers of this country stated that we are endowed with "certain unalienable Rights, that

among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers *from the consent of the governed*." (Emphasis added.) Declaration of Independence, July 4, 1776. The rights and powers of governmental entities in this country are *derived* from its citizens.

{¶ 20} In his dissenting opinion in *Haas*, *supra*, 51 Ohio St.2d at 140, 5 O.O.3d at 113, 364 N.E.2d at 1379, Justice William B. Brown summed up the entire matter by stating, "It is something of an anomaly that the common-law doctrine of sovereign immunity which is based on the concept that 'the king can do no wrong' was ever adopted by the American courts." (Footnote omitted.) Further, the United States Supreme Court has also indicated that there is no rational justification in American jurisprudence for the English legal maxim "the King can do no wrong." Specifically, in *Langford v. United States* (1879), 101 U.S. 341, 343, 25 L.Ed. 1010, 1011, the court stated, "We do not understand that either in reference to the government of the United States, or of the several States, or of any of their officers, the English maxim has an existence in this country."

{¶ 21} The rule of county or local district immunity did not originate with the concept of sovereign immunity. Indeed, legal authorities agree that the concept of local governmental immunity can be traced to the English case of *Russell v. Men of Devon* (K.B.1788), 100 Eng.Rep. 359, and the misapplication of *Russell* by a Massachusetts court in 1812.

{¶ 22} In *Russell*, the plaintiffs' wagon was damaged as a consequence of a bridge being out of repair. The plaintiffs sued the inhabitants of the unincorporated county for trespass on the case. However, the court denied recovery on the basis that the inhabitants were not incorporated and, thus, there was no fund from which a judgment could have been paid. In support of the holding, one member of the court said that "it is better that an individual should sustain an injury than that the public should suffer an inconvenience." *Id.* at 362.

{¶ 23} The rule of *Russell* was first introduced into this country in *Mower v. Inhabitants of Leicester* (1812), 9 Mass. 247, 1812 WL 927. In *Mower*, a stagecoach belonging to the plaintiff, Ephraim Mower, was traveling through the town of Leicester when one of his horses was fatally injured as a consequence of a bridge being out of repair. The plaintiff sued the inhabitants of Leicester, and a verdict was returned in his favor. In contrast to the county in *Russell*, the town of Leicester was incorporated and had a public treasury out of which any judgment could have been paid. However, ignoring the fact that Leicester was incorporated and that *Mower* was thus clearly distinguishable from *Russell*, the Massachusetts court held that no recovery could be had against the townspeople unless the recovery was authorized by statute. *Mower*, 9 Mass. at 250. *This rule of local government immunity then became the general American rule*. See Borchard, Government Liability in Tort, 34 Yale L.J. at 41-42; and *Muskopf, supra*, 55 Cal.2d 211, 11 Cal.Rptr. 89, 359 P.2d 457. However, a reading of *Mower* demonstrates that there existed no logical reason in that case for recovery to have been denied. In the words of Justice William B. Brown, "[t]he common-law precedent for municipal immunity (*Russell v. Devon* [1788], 100 Eng.Rep. 359), denied recovery because of the absence of a 'corporation fund' from which satisfaction could be made. Since the *Mower* case did not deal with a lack of a corporate fund, it was essentially decided on the grounds of which party should bear the loss." *Haas*, 51 Ohio St.2d at 140, 5 O.O.3d at 113, 364 N.E.2d at 1380, fn. 3 (William B. Brown, J., dissenting).

{¶ 24} Ohio courts in the early 1800s did not share the view that local government units were immune from liability. Rather, "[d]uring the period immediately following *Mower* and, indeed, throughout the early 1800's, Ohio courts favored imposition of liability on local government units. Concerned primarily with establishing a rule that promoted 'substantial justice,' Ohio courts considered municipal corporations and individuals equally responsible in tort.

Justice was considered served only by spreading the losses inflicted upon private individuals through the execution of governmental activity upon everyone who had shared a benefit from such activity." (Footnotes omitted.) Note, Municipal Immunity in Ohio—How Much Wrong Can a Municipality Do? (1984), 15 U.Tol.L.Rev. 1559, 1566. See, also, Comment, The Ohio Political Subdivision Tort Liability Act: A Legislative Response to the Judicial Abolishment of Sovereign Immunity (1986), 55 U.Cin.L.Rev. 501, 502 (the Ohio Supreme Court first introduced the doctrine of municipal sovereign immunity in 1854 and, prior to that time, courts treated Ohio municipalities the same as private individuals when imposing liability for wrongful acts or injuries); Comment, Can Municipal Immunity in Ohio be Resurrected from the Sewers after *Haverlack v. Portage Homes, Inc.*? (1983), 13 Cap.U.L.Rev. 41, 42 ("The early Ohio cases which dealt with municipal tort liability did not recognize immunity"); and Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio (1984), 32 Cleve.St.L.Rev. 367, 367-368 ("Municipal corporations have not always been protected by sovereign immunity in Ohio. Instead, early cases held municipalities subject to action in tort as a matter of basic justice").

{¶ 25} The doctrine of sovereign immunity was first applied in Ohio in 1840 in *State v. Franklin Bank of Columbus* (1840), 10 Ohio 91, 1840 WL 18. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Cleve.St.L.Rev. at 369. However, *Franklin Bank of Columbus* involved the liability of the state of Ohio—not a political subdivision of the state. It was not until the 1854 case of *Dayton v. Pease* (1854), 4 Ohio St. 80, 1854 WL 63, that the doctrine of sovereign immunity was expanded to include political subdivisions (municipal corporations) of the state. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Cleve.St.L.Rev. at 370. See, also, Comment, The Ohio Political Subdivision Tort Liability Act, *supra*, 55 U.Cin.L.Rev. at 502. Prior to our 1854 decision in *Pease*, Ohio courts had imposed

tort liability on municipal corporations as a matter of basic justice. See Celebrezze & Hull, The Rise and Fall of Sovereign Immunity in Ohio, *supra*, 32 Cleve.St.L.Rev. at 367-369; Comment, The Ohio Political Subdivision Tort Liability Act, *supra*, 55 U.Cin.L.Rev. at 502; and Note, Municipal Immunity in Ohio, *supra*, 15 U.Tol.L.Rev. at 1566. For example, in the several cases discussed below, spanning the period from 1831 to 1849, this court recognized the right to recover against political subdivisions (municipal corporations) of the state for injuries inflicted upon private individuals.

**{¶ 26}** In the first of these, *Goodloe v. Cincinnati* (1831), 4 Ohio 500, 1831 WL 35, the defendant, Cincinnati, performed street repairs that included the excavation of the existing street that abutted the plaintiff's house and paved alleyway. The plaintiff brought an action alleging that the defendant, while grading an adjacent street, maliciously damaged his walls and basement. While the allegation of malice suggests some form of intentional act, the facts support nothing more than a claim of simple negligence. The trial court found in favor of the plaintiff; however, on appeal the court of appeals reversed. On appeal, this court reinstated the trial court's judgment, holding, "When a corporation acts illegally or maliciously, we conceive it ought to be made directly responsible. Such is the plain dictate of justice, and we see no technical rule of law that forbids us to act upon it." *Id.* at 514. In reaching our conclusion we reasoned that municipal corporations in this country were performing all manner of operations for their own benefit and that "[w]hatever may have been the ancient doctrines, with regard to liability of corporations, for wrongs done by their agents, courts have gradually departed from them, and adopted principles more congenial to the state and condition of the world." *Id.* at 513.

**{¶ 27}** *Smith v. Cincinnati* (1831), 4 Ohio 514, 1831 WL 36, was decided on the same basis as *Goodloe*. However, in contrast to the decision in *Goodloe,* this court in *Smith* noted that the plaintiff did not allege that the actions of the city

were malicious. Thus, in order to succeed on a claim sounding in negligence, a plaintiff did not have to establish that a political subdivision's actions were malicious.

{¶ 28} In *Rhodes v. Cleveland* (1840), 10 Ohio 159, 1840 WL 31, this court further clarified the law with regard to the liability of political subdivisions. *Rhodes* involved a political subdivision digging drainage ditches that later flooded the plaintiff's land. This court reversed a verdict in favor of the political subdivision, where the jury was charged that the plaintiff could sustain his claim only if he showed that the defendant acted illegally or, if within its authority, acted maliciously. We forthrightly held that "corporations [political subdivisions] are liable like individuals, for injuries done, although the act was not beyond their lawful powers." *Id.* at 161. Thus, the court no longer confined its determinations of political subdivision liability to instances where the political subdivision had acted beyond the scope of its authority or had acted maliciously.

{¶ 29} *Rhodes* also stated that it did "not look so much for precedents as to the following out of incontestable principles; for the current of decisions, for a long time, has been to increase the liabilities of corporations." *Id.* The court further reasoned that "justice and good morals require that a corporation should repair a consequential injury which ensues from the exercise of its functions." *Id.* at 161. Chief Justice Lane wrote, "Every year furnishes new examples, of the *extension of remedies against them*, where injury is done, and remedies are applicable. It does not, therefore, appear to me to be a sufficient reason, against sustaining this suit, that in other states the remedy is not extended so far." (Emphasis added.) *Id.*

{¶ 30} In *McCombs v. Town Council of Akron* (1846), 15 Ohio 474, 1846 WL 120, the plaintiff alleged that the political subdivision, while grading a street, damaged the plaintiff's house and property. As in *Goodloe*, the facts of this case reflect nothing more than what we refer to today as simple negligence. The plaintiff asked the trial court to charge the jury that if the political subdivision caused injury

to the plaintiff's property, the plaintiff could recover *even if* the political subdivision acted strictly within its authority with no intent to injure the plaintiff's property. The trial court refused to make this instruction to the jury. On appeal, the trial court's judgment was affirmed.

{¶ 31} On appeal to the Supreme Court en banc, the court reversed, relying on *Rhodes*, and held that a political subdivision is liable for injuries resulting to the property of others from its act, though strictly within its corporate authority. In reaching its conclusion, *McCombs* questioned the genesis of corporate immunity and stated, "A sort of transcendentalism which enveloped both the courts and the profession in a mist growing out of the airy nothingness of the subject matter, enabled corporations, like pestilence which walketh unseen, to do their mischief and escape the responsibility." *Id.* at 480. This court further declared, " 'That the rights of one should be so used as not to impair the rights of another, is a principle of morals which, from very remote ages, has been recognized as a maxim of law.' " *Id*., quoting *Rhodes*, 10 Ohio at 160. The case was remanded to the trial court.

{¶ 32} Upon remand, the trial court issued jury instructions in accordance with the law set forth by this court, and the jury returned a verdict in favor of the plaintiff. Three years after the case was remanded it was appealed once again to this court. In *Town Council of Akron v. McCombs* (1849), 18 Ohio 229, 1849 WL 105, the political subdivision claimed that the first decision in *McCombs v. Town Council of Akron* (1846), 15 Ohio 474, 1846 WL 120, had introduced a new doctrine of "doubtful propriety." *Id.*, 18 Ohio at 230. In response, this court restated its reliance upon *Rhodes* as being the first decision in this state which recognized that an action "sounding in tort, would lie against a municipal corporation by name, for an act done within the powers granted by its charter." *Id.* at 231. This court held once again that the political subdivision "will be held liable to the party injured, to make good his loss." *Id*. at 232.

**{¶ 33}** The cases of *Goodloe* and *Smith* were ultimately tried before juries. See *Smith v. Cincinnati* (1831), 4 Ohio 514, 1831 WL 36, Reporter's Note. *Rhodes* and *McCombs*, too, were tried before juries. Each case involved an action sounding in negligence or, more particularly, an action for trespass on the case. It was not until *Dayton v. Pease* (1854), 4 Ohio St. 80, 1854 WL 63, that political subdivision immunity was discussed as a defense to the negligent acts of political subdivisions.

**{¶ 34}** In *Pease*, the defendant political subdivision, pursuant to a plan provided by the city engineer, began constructing a bridge over a canal. During the construction the bridge collapsed into the canal and blocked the water flow of the canal. The plaintiff owned a mill upstream from the fallen bridge, whose operation was prevented first by rising water, then by diversion of water upstream of the mill so that the wreckage could be cleared. The plaintiff sued the defendant for "wrongfully and injuriously" constructing a bridge that was so inartfully constructed that it fell into the canal and dammed up the water preventing the plaintiff from the use of his mill. In essence, the plaintiff claimed negligence. This court found that the political subdivision was liable for injuries resulting from the negligent acts of its agents, who were authorized and directed by the political subdivision.

**{¶ 35}** *Pease* distinguished *Rhodes* and both *McCombs* cases as holding that a political subdivision may be liable for acts through its agents, within the scope of its authority, *and without malice or negligence*. *Pease*, 4 Ohio St. at 94. *Pease* uses the term negligence to represent the carelessness of the city engineer in carrying out a task established by the political subdivision. The court in *Pease* distinguished *Rhodes* and both *McCombs* cases on the basis that, in *Pease,* the employee did not carry out the task carefully and skillfully, whereas in *Rhodes* and both *McCombs* cases, there were no allegations that the employees deviated from any directives placed upon them by the political subdivision, and, thus, the damages were not attributable to negligence. However, the facts as alleged in *Pease*, *Rhodes*,

and both *McCombs* cases, if viewed today, would all be treated as supporting negligence actions. Thus, the distinctions made by *Pease* are of no import today.

{¶ 36} Additionally, and contrary to the assertions in *Pease*, *Rhodes* did not predicate a political subdivision's liability upon a finding of negligence, maliciousness, or lack of authority. *Rhodes* held only that "corporations are liable like individuals, for injuries done, although the act was not beyond their lawful powers." *Rhodes,* 10 Ohio at 161. As a result of this discussion, it is clear that *Pease* failed to appreciably distinguish *Rhodes* and both *McCombs* cases, and did not even address *Goodloe* and *Smith*. Furthermore, *Pease* misused *Rhodes* to apply limitations on political subdivision liability that were clearly not intended.

{¶ 37} *Pease*, as a basis for reinvestigating the doctrines upon which *Rhodes* and *McCombs* were founded, had to distinguish those cases. *Pease*, 4 Ohio St. at 94. In furtherance of this, *Pease* discussed a number of New York cases that developed theories of political subdivision immunity and exceptions thereto, including governmental versus proprietary functions and ministerial versus discretionary acts. Yet in its discussion of these theories, *Pease* disregards the clear intention of *Rhodes*, which did not place any limitations on political subdivision liability beyond that which would apply to an individual. Finally, despite its discussions of political subdivision immunity, *Pease* ultimately found that the political subdivision was liable for the collapse of the bridge. *Pease*, 4 Ohio St. at 100-101.

{¶ 38} In addition to *Goodloe*, *Smith*, *Rhodes*, and *McCombs*, there is some evidence that the common law of this country at the time the Ohio Constitution was adopted in 1851 actually recognized no impediments to recovery against a corporate political subdivision of the state. In *Hack v. Salem* (1963), 174 Ohio St. 383, 392, 23 O.O.2d 34, 38, 189 N.E.2d 857, 862, Justice Gibson stated in a concurring opinion, "In the early reported American cases it apparently was assumed, without argument and as a matter of basic justice, that municipal

corporations were subject to actions for torts." Professor Barnett has said, "The earliest reported American case coming to attention that recognized the tort liability of a municipal corporation is *Hooe v. Alexandria* [(1802), 1 Cranch C.C. 90, 12 Fed.Cases 461, No. 6666], decided in 1802, in which no distinction was made between the tort liability of public and private corporations, and the city was held liable [in a jury trial], simply as 'a corporation.' " Barnett, The Foundations of the Distinction Between Public and Private Functions in Respect to the Common-Law Tort Liability of Municipal Corporations (1937), 16 Ore.L.Rev. 250, 259. Furthermore, Justice Gibson's concurrence in *Hack* makes clear that the early cases in Ohio took the same approach as to tort liability of municipal corporations. *Hack*, 174 Ohio St. at 392, 23 O.O.2d at 39, 189 N.E.2d at 863.

{¶ 39} Further, even if Ohio courts recognized immunity for corporate political subdivisions at the time of the adoption of the 1851 Ohio Constitution, such immunity apparently originated as an extension of the concept that "the King can do no wrong." However, as shown above, it appears that the historic justification for that English maxim never existed in this country. Therefore, it follows that the common law of this country should never have recognized such an impediment to an action against a political subdivision. Alternatively, county or local district immunity could have been predicated on the 1788 case of *Russell v. Men of Devon*, 100 Eng.Rep. 359. If so, any grant of immunity might have been the product of an enormous judicial mistake. *Russell* does not stand for the proposition that there exists county or local district immunity from liability for negligence. Indeed, just the opposite is true. That is, a careful reading of *Russell* indicates that recovery most likely would have been allowed had the defendants in the action been an incorporated governmental entity with a public treasury from which a judgment could have been paid. Therefore, the common law of this country actually recognizes no rational justification for extending immunity to political subdivisions of the state.

**{¶ 40}** Thus, the doctrine of sovereign immunity for political subdivisions was judicially created. As such, the doctrine could be judicially abolished. This court did so in *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749. In *Haverlack* we recognized that sovereign or governmental immunity was judicially created and, thus, could be judicially abolished:

"As aptly stated by Justice William B. Brown in *Haas*, *supra* [51 Ohio St.2d 135, 145, 5 O.O.3d 110, 116, 364 N.E.2d 1376, 1382], 'the judicially created doctrine of sovereign immunity is a legal anachronism which denies recovery to injured individuals without regard to the municipality's culpability or the individual's need for compensation.' * * * Because Ohio's sovereign immunity for municipalities was judicially created (see *State v. Franklin Bank of Columbus* [1840], 10 Ohio 91; *Western College of Homeopathic Medicine v. Cleveland* [1861], 12 Ohio St. 375 [1861 WL 41]; and *Thacker v. Bd. of Trustees of Ohio State Univ.* [1973], 35 Ohio St.2d 49, 67-68 [64 O.O.2d 28, 38, 298 N.E.2d 542, 552-553] [William B. Brown, J., dissenting]), it can be judicially abolished. * * * When we considered sovereign immunity last year, we noted that only six other states adhered to the traditional common law immunity doctrines. *Schenkolewski v. [Cleveland] Metroparks System* (1981), 67 Ohio St.2d 31, 38 [21 O.O.3d 19, 24, 426 N.E.2d 784, 788-789]. *Stare decisis* alone is not a sufficient reason to retain the doctrine which serves no purpose and produces such harsh results. Therefore, we join with the other states in abrogating the doctrine." *Haverlack*, 2 Ohio St.3d at 30, 2 OBR at 575, 442 N.E.2d at 752.

**{¶ 41}** *Haverlack* implies that sovereign immunity for municipalities was accepted in this state by 1840 in *Franklin Bank of Columbus*, *supra*, 10 Ohio 91. However, *Franklin Bank of Columbus* actually says that no suit can be brought against the *state*—not a *political subdivision* of the state. The other early case cited by the *Haverlack* court as creating sovereign immunity for municipalities was *W. College of Homeopathic Medicine v. Cleveland* (1861), 12 Ohio St. 375, 1861 WL

18

41, which did involve the liability of a political subdivision of the state, but which was decided after the adoption of Section 5, Article I of the Ohio Constitution.[6] It is also important to recognize that *Haverlack* adopted the historical analysis of sovereign or governmental immunity set forth in Justice William B. Brown's dissent in *Haas*, 51 Ohio St.2d at 140-145, 5 O.O.3d at 113-116, 364 N.E.2d at 1379-1382, and the analysis of Justice Gibson's concurrence in *Hack*, 174 Ohio St. at 391-402, 23 O.O.2d at 38-45, 189 N.E.2d at 862-869, wherein it was essentially argued that municipal immunity has no rational justification in the common law of this country.

**{¶ 42}** Although the court found no justification for sovereign immunity for municipalities, it went on to state, "We hold that the defense of sovereign immunity is not available, *in the absence of a statute providing immunity*, to a municipal corporation in an action for damages alleged to be caused by the negligent operation of a sewage treatment plant. A municipal corporation, *unless immune by statute*, is liable for its negligence in the performance or nonperformance of its acts." (Emphasis added.) *Haverlack,* 2 Ohio St.3d at 30, 2 OBR at 575, 442 N.E.2d at 752; see, also, paragraph two of the syllabus. These statements, however, were made without citation to any authority and without consideration of Section 5, Article I of the Ohio Constitution.

**{¶ 43}** The abolishment of "sovereign immunity" by this court set in motion activity by the General Assembly. In 1985, the General Assembly enacted R.C. Chapter 2744, the Political Subdivision Tort Liability Act. Included in that Act, in addition to other types of political subdivision immunity, is R.C. 2744.02(B)(5), the section of the Revised Code at issue in the case at bar.

---

6. Section 5, Article I of the Ohio Constitution provides, "The right to trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by a concurrence of not less than three-fourths of the jury." See discussion regarding the right to trial by jury, *supra*.

**{¶ 44}** Since the enactment of R.C. Chapter 2744, this court and courts all across the state have been called upon, time and time again, to unravel what that law provides as applied to a myriad of fact patterns. Often we have been referred to *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 550 N.E.2d 181, *Fabrey v. McDonald Village Police Dept.* (1994), 70 Ohio St.3d 351, 639 N.E.2d 31, and *Fahnbulleh v. Strahan* (1995), 73 Ohio St.3d 666, 653 N.E.2d 1186, for the propositions that the right to sue a political subdivision is not a fundamental right and that immunity existed at common law and thus there is no right to a jury trial. The last two of these cases rely on the *second sentence* of Section 16, Article I, which is inapplicable to political subdivisions because that section applies only to the state.

**{¶ 45}** Accordingly, the only cases that are pertinent for discussion on political subdivision tort liability are those which interpret R.C. Chapter 2744. In trying to arrive at equitable as well as law-based decisions, courts, one after another, have found it necessary, when interpreting various sections of R.C. Chapter 2744, to stretch the statute beyond its parameters. This occurs because courts are having to make equitable decisions in an inherently inequitable system.

**{¶ 46}** Thus, as recently as March of this year, this court decided *Muenchenbach v. Preble Cty.* (2001), 91 Ohio St.3d 141, 742 N.E.2d 1128, holding that a four-wheeled tractor equipped with a street-sweeping brush on the front and a scraper blade on the back, and being used in construction work, might be a motor vehicle "employed in general highway transportation." In writing for the court, Justice Resnick said that "for purposes of R.C. 2744.02(B)(1), a 'use standard' is an appropriate test for determining whether a vehicle is excepted from the definition" of motor vehicle found in R.C. 4511.01(B). *Id.* at 148, 742 N.E.2d at 1133. The *Muenchenbach* court, quoting the Court of Appeals for Cuyahoga County in *Putka v. Parma* (1993), 90 Ohio App.3d 647, 652, 630 N.E.2d 380, 383, stated that where a backhoe, customarily used in construction work, " 'is operated

on the public road like any other vehicle, it cannot be exempt as a *matter of law* from being classified as a "motor vehicle" on the pretext that it traveled a short distance.' " (Emphasis added.) *Muenchenbach*, 91 Ohio St.3d at 144, 742 N.E.2d at 1130.

{¶ 47} In 1999, this court decided *Perkins v. Norwood City Schools* (1999), 85 Ohio St.3d 191, 707 N.E.2d 868, with Chief Justice Moyer writing for the court. There we held that a school district was not entitled to immunity, pursuant to R.C. 2744.03(A)(5), where a student in the school fell and injured himself as a result of water on the floor, which was there from a leaking drinking fountain.

{¶ 48} In *Cater v. Cleveland* (1998), 83 Ohio St.3d 24, 697 N.E.2d 610, syllabus, we held, "The operation of a municipal swimming pool, although defined as a governmental function in R.C. 2744.01(C)(2)(u), is subject to the exceptions to immunity set forth in former R.C. 2744.02(B) * * *." In so holding, Justice Francis Sweeney found that glare caused by sunlight reflecting off a glass-paneled wall along the side of the pool was a nuisance, and, accordingly, the city could be liable for the drowning death of a twelve-year-old boy.

{¶ 49} In *Garrett v. Sandusky* (1994), 68 Ohio St.3d 139, 624 N.E.2d 704, a nearly unanimous court found that a wave pool is not a swimming pool: "In the present case, the Surf's Up Aquatic Center operated by the city was not merely a 'swimming pool.' The wave activation device at this facility materially transformed the pool from a placid body of water, commonly known as a swimming pool, to a potentially hazardous body of churning water. A wave pool is more akin to an amusement ride, which is not an immunized municipal function according to R.C. Chapter 2744." *Id.* at 140, 624 N.E.2d at 706. In concurring in judgment only, Justice Pfeifer discussed Section 16, Article I of the Constitution of Ohio. While that section of the Constitution applies to suits against the state and not a political subdivision (the governmental entity we had in *Garrett*), nevertheless what was said is important and makes the point. Justice Pfeifer said, "[T]he true intent

of the amendment to Section 16, Article I *was to abolish sovereign immunity in its entirety. * * * Governmental immunity, including municipal immunity*, is contrary to the clear meaning and mandate of the Ohio Constitution." (Emphasis added.) *Id.* at 144, 624 N.E.2d at 708.

{¶ 50} In 1997, *Hill v. Urbana* (1997), 79 Ohio St.3d 130, 679 N.E.2d 1109, was decided. Therein, an independent contractor was hired to assist Urbana in improving its water distribution system. The project was under the supervision of Urbana's Water Department supervisor. Hill, an employee of the independent contractor, was injured when the water pressure blew the valve off the pipe being worked on by Hill. The water was turned on prior to Hill's completion of his task, contrary to his specific requests. We held that because maintenance and operation of a municipal corporation water supply system is a proprietary function of a political subdivision under R.C. 2744.01(G)(2)(c), the political subdivision was not immune to suit for its negligence under R.C. 2744.02(B)(2).

{¶ 51} The forgoing sample listing of cases is by no means all-inclusive. There have been, and continue to be, many more. We have not, of course, been alone in this struggle. Courts of appeals all across this state continue to confront fact patterns presenting claims of sovereign immunity when the results of so finding would be inequitable at best and disastrous at worst.

{¶ 52} In *Groves v. Dayton Pub. Schools* (1999), 132 Ohio App.3d 566, 725 N.E.2d 734, a disabled student sued a school district seeking damages for injuries she suffered as a result of a district bus driver's alleged negligence in failing to secure her in her wheelchair when helping her off the bus. The statute being construed, R.C. 2744.02(B)(1), provided an exception to immunity where injuries were caused by the negligent operation on public roads of any motor vehicle by an employee of a political subdivision acting within the scope of his employment. The Second District Court of Appeals affirmed the trial court's denial of the political subdivision's motion to dismiss, holding that it could be inferred from the

complaint that the driver's actions were part of his duties and that it could be found that the driver was operating the school bus at the time of the student's injury. *Id.* at 570, 725 N.E.2d at 737.

**{¶ 53}** In *Hunsche v. Loveland* (1999), 133 Ohio App.3d 535, 729 N.E.2d 393, a political subdivision owned a park outside its corporate limits. On this land the city deposited a large pile of dirt. The city failed to maintain effective erosion-control measures, thus dramatically increasing the amount of water and sediment draining from the park into the pond of neighboring property owners. The First District Court of Appeals upheld the trial court's determination that the political subdivision was not immune from suit and that the city engaged in willful, wanton, and reckless conduct. *Id.* at 542, 729 N.E.2d at 397-398.

**{¶ 54}** As recently as December of last year, the Tenth District Court of Appeals decided *Hunter v. Columbus* (2000), 139 Ohio App.3d 962, 746 N.E.2d 246, discretionary appeal denied (2001), 91 Ohio St.3d 1493, 745 N.E.2d 439. For purposes of summary judgment there was evidence that a driver of an emergency vehicle, driving sixty-one m.p.h. in a thirty-five m.p.h. speed zone and driving left of center, crashed into a vehicle operated by plaintiff's decedent, thereby causing the death of plaintiff's decedent. The court held that the city was not entitled to immunity, because the driver's conduct could be found to be willful and wanton misconduct under R.C. 2744.02(B)(1)(c).

**{¶ 55}** Once again, the foregoing examples are just that—examples.[7] They are but a few examples of necessity being the mother of invention and resulting in

---

7. For some further cases involving judicially created exceptions to sovereign immunity, see *Harp v. Cleveland Hts.* (2000), 87 Ohio St.3d 506, 721 N.E.2d 1020; *Greene Cty. Agricultural Soc. v. Liming* (2000), 89 Ohio St.3d 551, 733 N.E.2d 1141; *Mfr's. Natl. Bank of Detroit v. Erie Cty. Rd. Comm.* (1992), 63 Ohio St.3d 318, 587 N.E.2d 819; *Doe v. Dayton City School Dist. Bd. of Edn.* (1999), 137 Ohio App.3d 166, 738 N.E.2d 390; *Globe Am. Cas. Co. v. Cleveland* (1994), 99 Ohio App.3d 674, 651 N.E.2d 1015; *Putka v. Parma* (1993), 90 Ohio App.3d 647, 630 N.E.2d 380; *Starling v. MetroHealth Ctr. Skilled Nursing* (Sept. 2, 1999), Cuyahoga App. No. 75554, unreported, 1999 WL 685641; and *Reed v. Perry Cty. Children's Serv.* (June 8, 1993), Perry App. No. CA-437, unreported, 1993 WL 221260.

judicially created exceptions to sovereign immunity. The danger is best described by the legal maxim *nil agit exemplum litem quod lite resovit*. A precedent accomplishes nothing if it settles one dispute by raising another. So many of these sovereign immunity cases do just that. In retrospect, they present more questions than the single question they answer.

**{¶ 56}** A review of these cases indicates that the exceptions to the rule of sovereign immunity are so numerous as to threaten to subsume the rule itself. The reason should be clear. This usually happens when a rule itself is faulty, *i.e.*, is not soundly based in legal history or the law. That is the case of the concept of sovereign immunity for political subdivisions. We have already reviewed, above, the legal history of the doctrine. That leaves yet to be discussed why the doctrine is also faulty when the Ohio Constitution (the law) is examined.

Trial by Jury

**{¶ 57}** The right to trial by jury derives from the Magna Carta. It is reasserted in both the Constitution of the United States and the Constitution of the state of Ohio. Even before the adoption of a state constitution, the first laws governing the territory of Ohio provided for the right to a trial by jury, stating, "No man shall be deprived of his liberty or property, *but by the judgment of his peers*, or by the law of the land * * *." (Emphasis added.) Article 2, Ordinance of July 13, 1787. For centuries, the right to a jury trial has been held to be a fundamental constitutional right. See *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1, 3. It is a substantive right, not a mere procedural privilege. See *id.* at paragraph one of the syllabus, and *Kneisley v. Lattimer-Stevens Co.* (1988), 40 Ohio St.3d 354, 356, 533 N.E.2d 743, 746.

**{¶ 58}** The right to trial by jury is one of the most fundamentally democratic institutions in the history of the human race. Throughout history, the right to trial by jury has been considered the crown jewel of our liberty. "For 500 years, trial by jury has been praised as the most cherished institution of free and intelligent

government that the world has ever seen and as the best institution for the administration of justice ever devised by the mind of man." 1 Few, In Defense of Trial by Jury (1993) 74.

{¶ 59} The founders of this great nation held the right to trial by jury in very high esteem. Prior to the ratification of our nation's Constitution, in a letter to James Madison, Thomas Jefferson expressed concern regarding the omission of a right to trial by jury in the proposed bill of rights. The Writings of Thomas Jefferson (Padover Ed.1967) 312. In particular, Jefferson recognized that several states had been "so incautious as to dispense" with the right to trial by jury and that to go forward without the right would reduce the more prudent states to the same level of "calamity" as those states that had dispensed with it. *Id.* Jefferson considered the exclusion of the right by other states and found it "much more just and wise to have concluded the other way, that as most of the States had preserved with jealousy this sacred palladium of liberty, those who had wandered, should be brought back to it; and to have established a general right rather than a general wrong." *Id.* Following the ratification of our nation's Constitution, while presenting the proposed Bill of Rights to the House of Representatives, James Madison stated that the civil jury is "one of the best securities of the rights of the people [which] ought to remain inviolate." 1 Few, In Defense of Trial by Jury (1993) 74. Thomas Jefferson lauded the right to a jury trial as among the principles that "[t]he wisdom of our sages and blood of our heroes" had been devoted to attain. He urged, "[S]hould we wander from them in moments of error or alarm, let us hasten to retrace our steps and to regain the road which alone leads to peace, liberty, and safety." The Writings of Thomas Jefferson (Padover Ed.1967) 274. Our forefathers were willing to sacrifice their very lives to preserve for the people of the United States of America the inestimable right to trial by jury.

{¶ 60} In the words of United States Supreme Court Justice (now Chief Justice) William J. Rehnquist, "The founders of our Nation considered the right of

trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary. * * * Trial by a jury of laymen rather than by the sovereign's judges was important to the founders because juries represent the layman's common sense * * * and thus keep the administration of law in accord with the wishes and feelings of the community." *Parklane Hosiery Co., Inc. v. Shore* (1979), 439 U.S. 322, 343-344, 99 S.Ct. 645, 657-658, 58 L.Ed.2d 552, 570 (Rehnquist, J., dissenting).

{¶ 61} The Ohio Constitution recognizes the fundamental right to trial by jury in Section 5, Article I, which states:

"The right of trial by jury shall be *inviolate*, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." (Emphasis added.)

{¶ 62} It is difficult to imagine a more forceful way of saying that the right to trial by jury should in no way be infringed.

{¶ 63} R.C. 2744.02(B)(5) operates to restrict Butler's right to hold appellant, CCDHS, and its employee liable for their negligence in ignoring the duty to inspect Guardian Angel before certifying it as a type-B day-care home. However, if Butler had a constitutionally protected right to a trial by jury in her action against CCDHS, then any application of R.C. 2744.02(B)(5) that restricts her right to a trial by jury would be constitutionally impermissible.

{¶ 64} Section 5, Article I of the Ohio Constitution does not guarantee a jury trial in all cases. Rather, "Section 5 of Article I of the Constitution of Ohio only guarantees the right of trial by jury in those cases where it existed previous to its adoption." *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus. See, also, *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 421, 633 N.E.2d 504, 510.

**{¶ 65}** Here, Butler asserted an action for negligence against CCDHS, a political subdivision of the state. Negligence actions evolved from the common-law action of trespass on the case, and there is no question that the right to trial by jury existed in such actions at the time the Ohio Constitution was adopted. Moreover, a right to trial by jury in a negligence action against a *political subdivision* existed at the time the Ohio Constitution was adopted, as we have set forth previously in discussing *Goodloe*, *Smith*, *Rhodes*, and *McCombs I* and *II*. Thus, Butler had a constitutionally protected right to trial by jury against CCDHS, and, accordingly, R.C. 2744.02(B)(5) should not be applied to negate any negligence of CCDHS, since doing so would violate Section 5, Article I of the Ohio Constitution.

**{¶ 66}** Additionally, the concept of sovereign immunity is applicable in this country (if at all) to the federal and state governments—not to the political subdivisions of the state. See, generally, Prosser & Keeton, Law of Torts (5 Ed.1984) 1033, 1043 and 1051, Section 131. Corporate political subdivisions of the state are not sovereign powers. By definition, a "sovereign" is "[a] person, body, or state vested with independent and supreme authority." Black's Law Dictionary (7 Ed.1999) 1401. "Sovereignty" means "[t]he supreme political authority of an independent state." *Id.* at 1402. In this regard, a political subdivision of a state government cannot by any stretch of the imagination be considered a sovereign power.

**{¶ 67}** Finally, a review of the constitutional and statutory provisions with respect to sovereign immunity is instructive. R.C. 2744.01(H) of the Political Subdivision Tort Liability Act provides, " 'State' means the state of Ohio * * *. 'State' does not include political subdivisions." R.C. 2743.01(A) of the Court of Claims Act reads the same: " 'State' means the state of Ohio * * *. 'State' does not include political subdivisions."

**{¶ 68}** R.C. 2743.01(B) provides, " 'Political subdivisions' means municipal corporations * * * and all other bodies corporate and politic responsible for governmental activities * * * *to which the sovereign immunity of the state attaches*." (Emphasis added.) The second sentence of Section 16, Article I, Ohio Constitution provides, "Suits may be brought against the state, in such courts and in such manner, as may be provided by law." This provision was placed in our Constitution, by a vote of the people of Ohio, as a product of the Constitutional Convention of 1912. In furtherance of this provision, the General Assembly passed the Court of Claims Act and R.C. 2743.02, effective in 1975. In R.C. 2743.02, the General Assembly purported to waive the immunity of the state, an immunity, of course, that did not exist, given the waiver in Section 16, Article I, Ohio Constitution and the common law. R.C. 2743.02(A)(1) very specifically provides, "The state hereby waives its immunity from liability and consents to be sued, and have its liability determined, in the court of claims created in this chapter in accordance with the same rules of law applicable to suits between private parties * * *."

**{¶ 69}** Therefore, pursuant to R.C. 2743.02(A)(1), the state has waived sovereign immunity and, accordingly, there is no sovereign immunity to attach to political subdivisions, pursuant to R.C. 2743.01(B). This includes, of course, "political subdivisions" as defined in R.C. 2743.01(B). Thus, for all of the foregoing reasons, "sovereign immunity" never was nor should it ever have been a viable legal doctrine according to which government can injure its citizens with immunity when the same injury is redressable if caused by one of the government's citizens.

## 2. Conclusion

**{¶ 70}** The facts of this case are tragic. Nevertheless, unless R.C. Chapter 2744 in general or any of its specific provisions in particular are found to be unconstitutional as violating either Section 5, Article I (jury trial) or the first

sentence of Section 16, Article I (right to remedy),[8] R.C. Chapter 2744 remains the law and must be interpreted and applied (albeit with many exceptions as noted) as written.

{¶ 71} We leave this subject for now with three additional thoughts. First, we do not say, and we do not mean to say, that CCDHS was negligent or did anything wrong in this case. The case was dismissed on a Civ.R. 12(B)(6) motion which, of course, requires us to view all of the allegations of the complaint as true. The only issue before us is whether CCDHS is statutorily immune regardless of any negligence on its part.

{¶ 72} Second, a finding that the concept of sovereign immunity is anathema to the thoughts of the founding fathers of our republic or is unconstitutional on the basis of the right to trial by jury or the right to remedy would not be the end of the world. If a political subdivision has an array of reasonable rules and regulations for dealing with its citizens in the performance of its duties, and it and its employees follow those rules, then actions they take that cause injury would not be negligence and, accordingly, there would be no liability—and no need for immunity. If the rules are ignored and negligence ensues and injury results, then the political subdivision can (and most now do) insure itself to compensate those who have suffered as a result of the negligence. This is no different from what, in many instances, the political subdivision requires of its citizens.

{¶ 73} Third, and maybe most important, applying such broad immunity to governmental wrongdoers gives no encouragement to do right, and no liability or penalty for doing wrong. When there is no accountability for failure, failure is sure to follow.[9]

---

8. The first sentence of Section 16, Article I, Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."
9. For comparison to another statute that imposes a duty but does not expressly impose liability, see *Marshall v. Montgomery Cty. Children Serv. Bd.* (2001), 92 Ohio St.3d 348, ___ N.E.2d ___.

**{¶ 74}** Socrates once said: "What is in conformity with justice should also be in conformity to the laws." The International Dictionary of Thoughts (1969) 416. Maybe that is why John Fitzgerald Kennedy said: "The achievement of justice is an endless process." *Id.* at 415.

**{¶ 75}** The judgment of the court of appeals is reversed and the judgment of the trial court is reinstated.

*Judgment accordingly.*

F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., and BROWN, J., concur in syllabus and judgment.

COOK and LUNDBERG STRATTON, JJ., separately concur in syllabus and judgment.

SUSAN BROWN, J., of the Tenth Appellate District, sitting for RESNICK, J.

_____

**COOK, J., concurring in judgment.**

**{¶ 76}** Because I agree that R.C. 5104.11 does not expressly impose liability upon a political subdivision within the meaning of R.C. 2744.02(B)(5), I join today's syllabus and judgment. While doing so, I continue to adhere to the views expressed in my dissenting opinion in *Campbell v. Burton* (2001), 92 Ohio St.3d 336, __ N.E.2d __. I write separately to respond to the plurality opinion's dicta addressing the constitutionality of R.C. Chapter 2744 and the history of political subdivision immunity.

**{¶ 77}** The constitutionality of R.C. Chapter 2744 is not at issue in this case. The plurality opinion ultimately recognizes this fact and accordingly decides this case on grounds of statutory interpretation alone. Nevertheless, the plurality opinion devotes several pages of the Ohio Official Reports to its not so subtle hint that R.C. Chapter 2744 violates Sections 5 and 16, Article I of the Ohio Constitution. Until these constitutional issues are directly presented to this court again, however, we should refrain from addressing them even in dicta.

**{¶ 78}** The plurality also undertakes a detailed analysis of the history of political subdivision immunity in order to show that the doctrine is "faulty." As the plurality observes, political subdivision immunity was a judicially created doctrine that this court ultimately abolished in the early 1980s. See *Haverlack v. Portage Homes, Inc.* (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749; *Enghauser Mfg. Co. v. Eriksson Eng. Ltd.* (1983), 6 Ohio St.3d 31, 33, 6 OBR 53, 54, 451 N.E.2d 228, 230, and paragraph one of the syllabus; *Zents v. Summit Cty. Bd. of Commrs.* (1984), 9 Ohio St.3d 204, 9 OBR 516, 459 N.E.2d 881, syllabus. In abolishing the immunity held by local governments, this court questioned the historical underpinnings of the immunity doctrine in much the same way that the plurality opinion does today. See *Enghauser Mfg. Co.*, 6 Ohio St.3d at 33-34, 6 OBR at 54-55, 451 N.E.2d at 230-231.[10]

**{¶ 79}** As instructive and important as the history of political subdivision immunity may be, however, it is of diminished significance when assessing the continued viability of the doctrine today. The General Assembly responded to *Haverlack*, *Enghauser Mfg.*, and *Zents* by enacting the Political Subdivision Tort Liability Act, declaring that political subdivisions would be liable in tort only as set forth in R.C. Chapter 2744. The legislature has therefore deemed political subdivision immunity to be desirable as the public policy of this state. Thus, any concern this court may have about the wisdom of political subdivision immunity or whether the doctrine is "soundly based in legal history or the law" is largely beside

---

10. This court's abolishment of political subdivision immunity was *not* complete. This court made clear that political subdivisions remained immune from liability "for those acts or omissions involving the exercise of a legislative or judicial function or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Enghauser Mfg. Co.*, paragraph two of the syllabus; see, also, *Zents*, syllabus. This court thus recognized that local governments remained immune from liability for "certain acts which go to the essence of governing," *i.e.*, conduct characterized by a high degree of discretion and judgment in making public policy choices. *Enghauser Mfg. Co.*, 6 Ohio St.3d at 35, 6 OBR at 56, 451 N.E.2d at 232. Accord *Whitney v. Worcester* (1977), 373 Mass. 208, 218-219, 366 N.E.2d 1210, 1216; *Muskopf v. Corning Hosp. Dist.* (1961), 55 Cal.2d 211, 220-221, 359 P.2d 457, 462-463, 11 Cal.Rptr. 89, 94-95.

the point. Questions concerning the wisdom of legislation are "for the legislature, and whether the court agrees with it in that particular or not is of no consequence. * * * If the legislature has the constitutional power to enact a law, no matter whether the law be wise or otherwise it is no concern of the court." *State Bd. of Health v. Greenville* (1912), 86 Ohio St. 1, 20, 98 N.E. 1019, 1021. If and when this court is called upon to assess the validity of R.C. Chapter 2744, the plurality's belief that political subdivision immunity is a "faulty" rule should play no part in deciding the issue.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

_____

*William D. Mason,* Cuyahoga County Prosecuting Attorney, *Sandra Curtis-Patrick* and *Arline M. Zehe,* Assistant Prosecuting Attorneys, for appellant.

*Novak, Robenalt, Pavlik & Scharf, L.L.P., William J. Novak, Thomas D. Robenalt* and *David W. Skall*, for appellee.

_____