*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0259p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UDINE ELLIS, Guardian for Lateasha Pendergrass,
                    *Plaintiff-Appellant,*

v.

CLEVELAND MUNICIPAL SCHOOL DISTRICT,
                    *Defendant-Appellee.*

No. 05-3192

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 03-01284—Lesley Brooks Wells, District Judge.

Argued: March 10, 2006

Decided and Filed: July 24, 2006

Before: SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

---

**COUNSEL**

**ARGUED:** James Brian Kenney, KEHOE & ASSOCIATES, LLC, Cleveland, Ohio, for Appellant. Keith Hansbrough, WILKERSON & ASSOCIATES CO., LPA, Cleveland, Ohio, for Appellee. **ON BRIEF:** James Brian Kenney, Robert D. Kehoe, KEHOE & ASSOCIATES, LLC, Cleveland, Ohio, for Appellant. Ernest L. Wilkerson, Jr., Kathryn M. Miley, WILKERSON & ASSOCIATES CO., LPA, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

ROGERS, Circuit Judge. Lateasha Pendergrass, through her guardian Udine Ellis, brought various state and federal claims against the Cleveland Municipal School District (the School District) after she had a physical altercation with Janice Gibbs, her third-grade substitute teacher. Pendergrass claims that Gibbs slammed her into a chalkboard, threw her on the ground, and choked her. After the district court granted summary judgment in favor of the School District on several of Pendergrass's claims, the case went to trial on Pendergrass's claim of failure to train or supervise under 42 U.S.C. § 1983. At the close of Pendergrass's case-in-chief, however, the district court granted judgment as a matter of law in favor of the School District. Pendergrass now appeals, arguing: (1) the School District was not entitled to immunity on Pendergrass's state-law claims because Ohio's Political Subdivision Tort Liability Act violates the Ohio constitution; (2) the district court should have granted her motion to admit reports of abuse by other teachers as a sanction; and

(3) the School District was not entitled to judgment as a matter of law on her § 1983 claim of failure to train or supervise. We affirm.

## I.

Gibbs worked as a substitute teacher for the School District between 1998 and 2002. Gibbs had a long-term substitute license from the Ohio Department of Education, qualifying her to teach grades seven through twelve. Although Gibbs was given assignments to teach in an elementary school, the School District did not require certification in specific grade levels. A criminal background check demonstrated that Gibbs did not have a prior criminal record, and before 2002 Gibbs had never had a physical altercation with a student.

### A.     Training and Supervision of Substitute Teachers

The School District required Gibbs, as a substitute-teacher applicant, to undergo training before she could be eligible for hiring. All substitute-teacher applicants had to attend an orientation: for large groups, the orientation lasted half a day; otherwise, the orientation was conducted for a shorter duration on an individual basis. During the orientation, the School District informed substitute teachers that its policy prohibited corporal punishment. The School District also instructed the teachers on how to handle student misbehavior and discipline, including altercations between teachers and students, though there is nothing in the record which describes this training. Gibbs attended a group orientation before she was hired.

The School District did not require any training beyond the initial orientation for substitute teachers. It did, however, offer voluntary, ongoing professional development training. Gibbs attended several of these training sessions, but none of the sessions involved handling altercations with students.

The School District published a Substitute Teachers Manual (Manual) and a Substitute Teachers Handbook. The Manual explained that substitute teachers were "expected to maintain primary control of the classroom" and that, "[i]f a disciplinary situation should occur, the substitute teacher should use professional judgment in seeking the assistance of a principal or assistant principal." Regarding corporal punishment, the Manual provided in relevant part that:

> The District eliminated corporal punishment as a method of resolving discipline problems, effective September 1987. Corporal punishment is defined as the act of inflicting or causing to be inflicted bodily pain upon a student as a penalty for the commission or omission of an act. Any form of corporal punishment is prohibited.

The Manual further stated that "[a]ll substitute teachers are required to study this handbook and . . . be familiar with these policies." Although Gibbs remembered receiving a packet of information, she does not specifically recall receiving the Manual, going over the Manual during orientation, or the content of the Manual.

Once Gibbs began teaching at Steven E. Howe Elementary School, the responsibility for her supervision fell on the principal, Angela Powers. The School District did not have any particular policy on how the supervision was to be conducted. Powers testified that she supervised her substitute teachers "by observing them, going to classrooms, [and] assisting them, if they need to know where different places are in our school." Powers did not evaluate the teachers or provide coaching on how to teach or control the class.

**B.      The Altercation**

From May 2 to May 3, 2002, Gibbs worked as a substitute at Steven E. Howe Elementary in Pendergrass's third-grade class.  At the time, Pendergrass was eight years old.  On May 3, a physical altercation occurred between Gibbs and Pendergrass.  Because the circumstances of the altercation are disputed, we provide a summary of both Gibbs's and Pendergrass's versions.

*1.       Gibbs's Version*

Gibbs had been trying to get Pendergrass to complete her morning assignment, but Pendergrass refused.  Because it was Pendergrass's third warning for inappropriate behavior, Gibbs told her to write her name on the disruptive student list.  Instead of writing her name on the list, Pendergrass knocked the list off of the table and refused to pick it up.  Gibbs told Pendergrass to leave the classroom and go to the office.  Pendergrass replied, "No, make me."

Gibbs walked over, and Pendergrass started hitting her.  After trying to block Pendergrass's blows and asking Pendergrass to stop, Gibbs pushed Pendergrass and held her head against the chalkboard.  When Pendergrass stopped swinging, Gibbs let her go.  Pendergrass again began hitting Gibbs.  Gibbs then tried to grab Pendergrass's hands, lost her balance, and fell on top of Pendergrass.  When Gibbs regained her balance, she sat on Pendergrass, and restrained her by holding her head back from under her chin.  Although Gibbs admits that she physically restrained Pendergrass by holding her chin, she denies ever choking Pendergrass.

*2.       Pendergrass's Version*

Pendergrass's testimony regarding the altercation significantly differed from that of Gibbs:

> When I went to class the next day, my substitute told us to take out a pencil and to write in our journal about the weekend or what she had on the black board.  And I told her I didn't have a pencil.  So she got up and told me to write my name on the board, and I did, and she got mad at me, and she slammed me up against the wall, and the back of my head hit the board, and she then slung me on the ground and jumped on me and started choking me.

According to Pendergrass, Gibbs slammed her head against the blackboard hard enough to give her a headache.  Gibbs then threw her on the ground and choked her for about one minute.

**C.      Pendergrass's Injuries**

After Pendergrass spoke with school officials and police officers, her grandmother took her to the hospital.  A physician concluded that Pendergrass had sustained petechia and contusions on her neck.  Petechia are red marks that result from the application of pressure to a particular area of the skin.  Police officers took photographs of the marks at the hospital.

Pendergrass later suffered from less visible injuries.  She began having bad headaches and nightmares about the altercation.  She avoided reminders of the altercation, trying not to walk past her old classroom.  If she saw a person resembling Gibbs, she would become fearful and move away from that person.  Based upon these symptoms, a therapist diagnosed Pendergrass with post-traumatic stress disorder.

## II.

Pendergrass brought suit against the School District originally in an Ohio state court.  In her complaint, Pendergrass asserted five state and federal claims:  (1) negligence for failure to properly screen, hire, train, or supervise Gibbs under Ohio law; (2) gross negligence under section 2744.02(B)(5) of the Ohio Revised Code; (3) failure to screen, train, or supervise under 42 U.S.C. § 1983; (4) interference with the right of access to redress in state court under § 1983; and (5) a claim for a declaratory judgment that Ohio's Political Subdivision Tort Liability Act (Liability Act), Ohio Rev. Code §§ 2744.02, 2744.03, violates article I, sections 5 and 16, of the Ohio constitution.  The School District removed the case to the federal district court below.

The School District filed a motion for summary judgment.  In August 2004, the district court granted the motion as to the state-law claims, the § 1983 claim of interference with the right of access to state courts, and the claim for declaratory judgment, but the court denied the motion as to the § 1983 claim of failure to train or supervise.[1]  In particular, the district court first ruled that Pendergrass had failed to present sufficient evidence to establish her state-law claims of negligent and grossly negligent screening, hiring, or supervision.  Pendergrass had raised a material issue of fact regarding her state-law claim of negligent training, but the court ruled that the Liability Act immunized the School District from liability.  The district court then ruled that Pendergrass was not entitled to a declaratory judgment that the Liability Act was unconstitutional because, despite the dicta of a plurality of the Supreme Court of Ohio in *Butler v. Jordan*, 750 N.E.2d 554, 568-71 (Ohio 2001), Ohio intermediate courts had unanimously found the Act constitutional.  Regarding the § 1983 claims, the district court ruled that Pendergrass had raised a material issue of fact as to her claim of failure to train or supervise, but failed as to her claim of access to state courts.

Both Pendergrass and the School District filed motions in limine to exclude certain evidence before trial.  The School District requested, among other things, that the district court exclude "collateral incident reports" detailing other students' allegations of assault by substitute teachers, because such reports were inadmissible as subsequent remedial measures.  The district court denied the School District's motion.  Pendergrass requested, among other things, that the court admit the collateral incident reports as a sanction for the School District's alleged failure to provide a knowledgeable representative for deposition pursuant to Federal Rule of Civil Procedure 30(b)(6).  The district court ruled that, because it had denied the School District's motion to exclude the statements, Pendergrass's motion to admit the statements was moot.

The case went to trial in January 2005 on Pendergrass's § 1983 claim of failure to train or supervise.  Despite its earlier ruling that Pendergrass's motion to admit the collateral incident reports was moot, the district court excluded approximately half of the reports.  Reports relating to incidents that occurred after the altercation between Gibbs and Pendergrass were excluded because they were irrelevant to the issue of whether the School District had been deliberately indifferent to substitute-teacher abuse.  The district court did not exclude the ten incident reports relating to alleged abuse by teachers prior to the altercation, although the reports were never admitted into evidence.  Instead the record reflects that, following a hearsay challenge, J.A. at 1091, the court, pursuant to a stipulation of the parties, informed the jury only of the existence and dates of the pre-altercation reports, J.A. at 1092-93.

At the close of Pendergrass's case-in-chief, the School District moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law.  The district court ruled that Pendergrass

---

[1]In its order, the district court stated that Pendergrass had alleged a § 1983 claim of failure to screen, train, or supervise, but the court analyzed only the failure to train or supervise.  It is unclear from the record why the court ignored Pendergrass's failure-to-screen theory.  Nevertheless, because Pendergrass does not raise the School District's failure to screen on appeal, she has abandoned the theory.  *See Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).

had failed to demonstrate an underlying constitutional injury because, even under Pendergrass's version of the altercation, "no reasonable person could conclude that Ms. Gibbs demonstrated 'brutal and inhumane abuse of official power literally shocking to the conscience.'" In addition, the district court ruled that Pendergrass had not demonstrated that the School District had a policy or custom of inaction towards abuse by substitute teachers. According to the court, the ten reports of alleged prior assaults by teachers in a two-year period were "wholly insufficient to establish a 'clear and persistent pattern of abuse by substitute teachers.'" Because there was no legally sufficient evidentiary basis for a reasonable jury to find that the School District had a policy or custom of failing to train or supervise substitute teachers properly, the district court granted the School District's motion for judgment as a matter of law.

Pendergrass now appeals, arguing that (1) the Liability Act violates the Ohio constitution, thus making the district court's grant of summary judgment as to her state failure-to-train claim erroneous; (2) the district court erred by not admitting the incident reports "if for no other reason, as a sanction for [the School District's] conduct"; and (3) a reasonable jury could have found the School District liable under § 1983 for failure to train or supervise.

### III.

#### A.    Constitutionality of Ohio's Political Subdivision Tort Liability Act

The district court properly held that the Liability Act, Ohio Rev. Code §§ 2744.02, 2744.03, does not violate article I, sections 5 and 16, of the Ohio constitution because the Supreme Court of Ohio has never held the statute unconstitutional and because Ohio's intermediate courts are unanimous in upholding the statute. When deciding an issue of state law, we apply the law of the state's highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "Where a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us." *Kirk v. Hanes Corp. of N.C.*, 16 F.3d 705, 707 (6th Cir. 1994).

No majority decision of the Supreme Court of Ohio has ever held the Liability Act unconstitutional. On the contrary, the law of the supreme court remains that the statute is constitutional. In *Fabrey v. McDonald Village Police Department*, the supreme court held that the Liability Act does not violate the equal protection; due process; or article I, section 16, right to remedy provisions of the Ohio constitution.[2]  639 N.E.2d 31, 33-35 (Ohio 1994).

The supreme court's dicta in *Butler v. Jordan*, 750 N.E.2d 554 (Ohio 2001), did not work a change because it was pronounced by a plurality of the court. In *Butler*, the supreme court held that an Ohio statute did not expressly impose liability for negligence or recklessness in the inspection and certification of certain day-care facilities, and the defendant was therefore immune under the Liability Act. *Id.* at 554. Nevertheless, a plurality of three of the seven justices went on to question the constitutionality of the Liability Act. *Id.* at 558. In the plurality's opinion, there was a serious question whether the Liability Act violated the right to trial by jury guaranteed by article I, section 5, of the Ohio constitution because citizens of Ohio had the right to demand a jury trial in negligence actions at the time the Ohio constitution was adopted. *Id.* at 569-70. The plurality also appeared to suggest that the Act violated the right to remedy under section 16. *See id.* at 570-71. The plurality nonetheless voted to apply the law whose constitutionality it questioned. *See id.* at 571 ("Chapter 2744 remains the law and must be interpreted and applied . . . as written.").

---

[2]Article I, section 16, of the Ohio constitution provides that "every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law . . . .  Suits may be brought against the state, in such courts and in such manner, as may be provided by law."

The plurality dicta does not represent the view of the majority of the Supreme Court of Ohio and was not even applied by the plurality in that case, and thus it cannot be said that it represents Ohio law. *See Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 552 (6th Cir. 2001). Because "the state's highest court has not decided the applicable law, then [this] court must ascertain the state law from 'all relevant data,'" including the state's intermediate court decisions. *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)).

Every decision of the Court of Appeals of Ohio that has entertained challenges to the Liability Act has found the statute constitutional. *See, e.g.*, *Nagel v. Horner*, 833 N.E.2d 300, 302-03 (Ohio Ct. App. 2005); *Thompson v. Bagley*, No. 11-04-12, 2005 WL 940872, at *3-5 (Ohio Ct. App. Apr. 25, 2005); *Bundy v. Five Rivers Metroparks*, 787 N.E.2d 1279, 1283-88 (Ohio Ct. App. 2003). If "the only precedent is from the state's intermediate appellate courts, the intermediate court's decision should be followed absent a strong showing that the state supreme court would act in a different manner." *Derungs v. Wal-Mart Stores, Inc.*, 374 F.3d 428, 433 (6th Cir. 2004). Because a majority of the supreme court has never held that the Liability Act is unconstitutional, there has been no showing that the supreme court would act differently from the courts of appeals. Therefore, we read Ohio's law in its current state to provide that the Liability Act is constitutional.[3]

## B.    Exclusion of the Collateral Incident Reports

Although the district court erred when it denied as moot Pendergrass's motion to sanction the School District by admitting all of the collateral incident reports, the error was harmless because the reports that the district court ultimately excluded were irrelevant and thus inadmissible under Federal Rules of Evidence 401 and 402. Pendergrass limits her sanction argument to the district court's refusal to impose the particular sanction of admitting all of the incident reports. Both parties argue that this court should review the district court's decision not to admit the reports as a sanction under an abuse of discretion standard. The district court, however, never reached the issue whether sanctions were necessary; instead, the district court ruled that Pendergrass's motion was moot because the court had denied the School District's motion to exclude the reports as subsequent remedial measures. This court reviews mootness decisions de novo.

The district court erred when it ruled that Pendergrass's motion for sanctions was moot. Generally, "a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). The district court apparently thought the admissibility of all of the collateral incident reports was no longer a live issue because it had already overruled the School District's argument that the reports were subsequent remedial measures. However, because the district court denied one challenge to the admissibility of the reports does not mean that the reports could not be challenged on other grounds. That half of the reports were later excluded demonstrates the issue was indeed live.

While the issue was not moot as the district court reasoned, any error was harmless as to the reports made both before and after the altercation between Gibbs and Pendergrass. At trial, the district court informed the jury that the parties had stipulated to the existence of ten reports of alleged abuse by teachers prior to the altercation, and the court then read to the jury the incident

---

[3]We recognize that one federal district court has relied on *Butler* to hold the Liability Act unconstitutional, *see Estate of Owensby v. City of Cincinnati*, 385 F. Supp. 2d 626, 629-31 (S.D. Ohio 2004), *aff'd on other grounds*, 414 F.3d 596 (6th Cir. 2005); *Kammeyer v. City of Sharonville*, 311 F. Supp. 2d 653, 661-62 (S.D. Ohio 2003), but later decisions from the same district now reject that position, *see Samples v. Logan County*, No. C2-03-847, 2006 WL 39265, at *11 (S.D. Ohio Jan. 6, 2006); *Grant v. Montgomery County Job & Family Servs.*, No. 04-CV-798, 2005 WL 2211266, at *1-2 (S.D. Ohio Sept. 8, 2005); *Armstrong v. U.S. Bank*, No. C-1-02-701, 2005 WL 1705023, at *9 n.7 (S.D. Ohio July 20, 2005). We agree with the more recent decisions.

dates and the involved students' dates of birth. Thus, despite the court's refusal to admit the reports as a sanction, the jury was given the substance of the reports when it later learned that the School District had notice of ten prior incidents of alleged substitute-teacher abuse.

The district court's mootness determination regarding post-altercation reports was also harmless. The court later excluded reports of abuse after the altercation between Gibbs and Pendergrass, but the exclusion was proper because the reports were irrelevant to Pendergrass's § 1983 claim of failure to train or supervise. Evidence is relevant, and hence generally admissible, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Whether the School District knew of abuse by substitute teachers *after* the altercation has no bearing on whether the School District was deliberately indifferent to abuse at the time Pendergrass was injured. Pendergrass's claim fails because she offers no support for the notion that, had the district court not found her motion moot, the court would have abused its discretion by not admitting the irrelevant reports as a sanction. In fact, Federal Rule of Evidence 402 likely would have precluded the court from admitting them. *See* Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."). For these reasons, any error in finding the admissibility of the incident reports moot was harmless.

## C.    Failure to Train or Supervise

The district court properly granted judgment as a matter of law as to Pendergrass's claim of failure to supervise or train under 42 U.S.C. § 1983. Assuming that Pendergrass presented sufficient evidence for a jury to find that Gibbs's actions constituted a violation of substantive due process, Pendergrass's claim still fails. No reasonable jury could find that the School District had been deliberately indifferent to substitute-teacher abuse.

### 1.    *Standard of Review*

This court reviews a district court's grant of judgment as a matter of law de novo. *McCombs v. Meijer, Inc.*, 395 F.3d 346, 352 (6th Cir. 2005). Judgment as a matter of law is appropriate only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a)(1). As with our review of summary judgment, this court must review the entire record, "draw all reasonable inferences in favor of the nonmoving party, and . . . not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### 2.    *Underlying Constitutional Violation*

Taking the facts in the light most favorable to Pendergrass, we assume that she suffered a constitutional injury and would therefore survive judgment as a matter of law on the first step of a municipal liability claim under § 1983. To succeed on her municipal liability claim, Pendergrass must demonstrate both: (1) the deprivation of a constitutional right, and (2) the School District is responsible for that violation. *Doe v. Claiborne County*, 103 F.3d 495, 505-06 (6th Cir. 1996). To demonstrate that her punishment violated her substantive due process rights, Pendergrass must prove that "the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987)

We assume that, taking the facts in the light most favorable to Pendergrass, Gibbs's actions met this standard. According to Pendergrass, because she forgot to bring a pencil to class, Gibbs grabbed her and slammed her head against the blackboard. Gibbs then threw her on the ground and choked her for approximately one minute. As a result, Pendergrass suffered petechia and contusions

on her neck.  Later, Pendergrass also exhibited symptoms consistent with post-traumatic stress disorder.  *See id.* at 1154, 1158-59 (holding that a high school principal's actions, in breaking down a student's door, throwing the student against a wall, and slapping the student, were shocking to the conscience).

### 3.     *Custom or Policy of Failure to Train or Supervise*

Pendergrass's claim of failure to train or supervise nonetheless fails because no reasonable jury could find that the School District was deliberately indifferent to complaints of abuse by substitute teachers.  A plaintiff who sues a municipality for a constitutional violation under § 1983 must prove that the municipality's policy or custom caused the alleged injury.  *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).  One way to prove an unlawful policy or custom is to show a policy of inadequate training or supervision.  *See City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).  We assume for the purpose of argument that a reasonable jury could find that Cleveland's training and supervision of substitute teachers was inadequate, such that the first prong is met for purposes of judgment as a matter of law.

Pendergrass's claim fails under the second prong, however, because she did not present sufficient evidence that the School District was deliberately indifferent to the danger of substitute-teacher abuse.  This court has identified two situations justifying a conclusion of deliberate indifference in claims of failure to train or supervise.  "One is failure to provide adequate training in light of foreseeable consequences that could result from a lack of instruction."  *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999).  In *City of Canton*, for example, the Supreme Court indicated that a city could be deliberately indifferent by failing to train its police officers in the use of deadly force because it is obvious that the officers will need to use such force when they are armed with guns and required to arrest fleeing felons.  489 U.S. at 390 n.10.  In this case, Pendergrass does not argue that it was inherently foreseeable that teachers would assault students if not trained or supervised properly.  Instead, Pendergrass argues a different type of deliberate indifference.  "A second type of . . . deliberate indifference is where the city fails to act in response to repeated complaints of constitutional violations by its officers."  *Brown*, 172 F.3d at 931.  According to Pendergrass, the ten incident reports of prior abuse put the School District on notice that it had a problem with substitute-teacher abuse.

These ten reports were not sufficient to permit a reasonable jury to find that the School District had been deliberately indifferent.  While all of the reports document incidents of corporal punishment, only two arguably rise to the level of Pendergrass's alleged abuse.  *See* J.A. 560-69 (pushing student's face into chalkboard and making student hold arms stretched out); J.A. 570-74 (kicking and choking student).  The other eight reports document more mild punishment.  *See, e.g.*, J.A. at 630-36 (grabbing student by arm and smashing his brother's crayon box).  Thus, the School District had notice of only two incidents of possible constitutional violations.  Pendergrass has not shown how two incidents, over a two-year period, could put the School District on notice of a problem when the School District operated 127 schools with over 69,000 students.  To establish deliberate indifference through these reports, Pendergrass would have had to allege and put on some evidence that two incidents of abuse over two years is an excessive number.[4]

---

[4] Pendergrass attempts to establish the School District's deliberate indifference also through the testimony of Dr. Barbara Byrd-Bennett, the Chief Executive Officer of the School District, that Bennett typically received 60 to 70 letters a week from the Division of Children and Family Services regarding child abuse of her students.  However, neither Byrd-Bennet's testimony nor Pendergrass indicates whether the letters related to abuse by substitute teachers,

Such a conclusion is compelled by our decision in *Thomas v. City of Chattanooga*, 398 F.3d 426, 431 (6th Cir. 2005). In *Thomas*, the plaintiff introduced evidence of forty-five suits of excessive force against the Chattanooga Police Department to establish that the department had a custom of condoning excessive force by its officers. *Id.* at 430. This court held that such evidence was "conclusory" because the plaintiff "did not produce any data showing what a 'normal' number of excessive force complaints would be." *Id.* at 431. Similarly, because Pendergrass has not presented any evidence that two incidents of substitute-teacher abuse is more than what the normal number of incidents would be, she cannot show that the School District had notice of a problem requiring additional training or supervision. Thus, as a matter of law, her claim of failure to train or supervise fails because a reasonable jury could not find the School District deliberately indifferent.[5]

## IV.

For the foregoing reasons, we affirm the judgment of the district court.

---

full-time teachers, or any person (e.g., by a parent).

[5] Pendergrass also argues that the district court erred when it "did not even address [her] claim of acquiescence." At oral argument, Pendergrass's counsel elaborated upon the acquiescence claim, arguing that a municipality may be liable under § 1983 for later "ratifying" unconstitutional conduct. We have not found any legal support for the proposition that, in the absence of deliberate indifference before a constitutional violation, a municipality may be liable for simply failing to investigate or punish a wrongdoer *after* the violation.