NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0134n.06

No. 20-2258

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| BENJAMIN LOPEZ, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| REGAN FOERSTER, et al., | ) | |
| Defendants, | ) | |
| | ) | |
| RANDY GRAHAM, individually and in his official capacity, jointly and severally; TRAVERSE NARCOTICS TEAM, jointly and severally, | ) | |
| Defendants-Appellees. | ) | |

FILED
Mar 29, 2022
DEBORAH S. HUNT, Clerk

Before: SUHRHEINRICH, STRANCH, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. "Benny" Lopez of Traverse City sold heroin to a confidential informant working with the Traverse Narcotics Team in northern Michigan. "Benjamin" Lopez of Grand Rapids did not. Yet officers arrested Benjamin, not Benny, for this crime. The wrong Lopez languished in jail for 24 days due to this identification error. Benjamin Lopez brought this suit under 42 U.S.C. § 1983 alleging that various state actors unreasonably seized him in violation of the Fourth Amendment. Lopez, however, has since settled with the officer who misidentified him as Benny. He now pursues claims only against a supervisor, Detective Sergeant Randy Graham, and the Traverse Narcotics Team itself. But § 1983 does not allow Lopez to hold Graham

or the Team liable for the other officer's mistake. And Graham reasonably believed that the officer intended to arrest Benny from the Traverse City area. Lopez also failed to show that the Team had a history of making similar misidentifications. So despite our sympathies for Lopez's predicament, we must affirm the grant of summary judgment to these two defendants.

I

Together with the Michigan State Police Department, several northern Michigan counties entered into an agreement to form the Traverse Narcotics Team. *See* Mich. Comp. Laws § 124.507(1). The Team, a cooperative task force, pooled state and county personnel and resources to better detect drug crimes. Graham, a detective with the Michigan State Police Department, supervised the Team's work. Officer Regan Foerster worked on the Team through his employment with a sheriff's department in a participating county.

On June 22, 2017, Foerster arranged for a confidential informant to make a controlled drug buy at a Traverse City gas station. The informant called someone named Benny Lopez to set up this deal. Foerster and another task-force officer recorded the call and then watched the informant buy a gram of heroin from "Benny" at the gas station.

The officers, however, did not get a good view of this man. Foerster also did not know a "Benny Lopez." When attempting to identify this suspected drug dealer, he took what Detective Graham later conceded were "shortcuts." Graham Dep., R.95-1, PageID 636. Foerster did not try to connect the phone number that the informant had called to anyone named Benny. Nor did he attempt to match the license plate of the drug dealer's car to Benny. Foerster also did not search the Traverse Narcotics Team's internal database for prior investigations involving a "Benny Lopez." That search would have revealed that the Team had investigated a local man named

Benny Lopez, Jr., for previous drug activity in the Traverse City area. Graham had participated in the earlier investigation and was familiar with this person.

What did Foerster do instead? Assuming that "Benny" was short for "Benjamin," he searched Michigan's statewide law-enforcement database for information on people named "Benjamin Lopez." The search returned a hit for a "Benjamin Lopez" from Grand Rapids—the plaintiff in this case, not the Benny from Traverse City who had sold heroin to the informant. Using this database's results to fill out an incident report, Foerster identified the suspect as "Benjamin Ben Lopez" with an alias of "Benny." Rep., R.95-6, PageID 670. His report also copied the statewide database's personal identifying information for Benjamin Lopez (things like his height and weight). Yet Foerster failed to include Benjamin Lopez's Grand Rapids address.

When supervising the Traverse Narcotics Team, Detective Graham generally followed the policies of the Michigan State Police Department. One of these policies required him to review pending casefiles monthly to ensure that, among other things, open cases were timely progressing. A couple of months after the controlled buy, Graham conducted his monthly review of the Lopez file and added the following comment: "Note to Foerster to pursue further purchases or submit your case for a warrant request." Rep., R.95-6, PageID 676. Other than potential informal conversations, Graham had not discussed the case with Foerster up to this point. Because the casefile did not include the Grand Rapids address for Benjamin Lopez, Graham also assumed that the suspect was the Benny Lopez whom he knew from the Traverse City area.

Rather than undertake more controlled buys, Foerster chose to seek an arrest warrant for Benjamin Lopez based on the controlled buy and the information from the statewide database. According to Foerster, the confidential informant also examined a photograph of Benjamin Lopez and wrongly identified him as the suspected drug dealer. Another officer suggested that the

3

photograph may have been of Benny instead. The informant also suggested that this photo identification never even occurred. So we must assume that it did not at this stage. In all events, the officers themselves later opined that Benjamin bore an uncanny resemblance to Benny.

A state judge granted the arrest warrant. On October 15, 2017, Grand Rapids officers located and arrested Benjamin Lopez in the Grand Rapids area. After Lopez spent a few days at a jail there, officers from farther north picked him up to transport him to a jail in the Traverse City area. Lopez professed his innocence to these officers and explained that he had never even visited Traverse City.

At some point, a state employee spoke with Lopez at the Traverse City jail. This employee knew of the "Benny" from the Traverse City area and recognized that the jailed Benjamin may be a different person. On October 31, she contacted Foerster to inform him of the potential misidentification. After learning of Benny's existence, Foerster brought the issue to Graham's attention on November 1. Graham instructed Foerster to quickly contact the prosecutor and request a dismissal of the charges.

Foerster explained the issue to the prosecutor on the same day. The prosecutor agreed to dismiss the charges. Graham followed up with the prosecutor the next day and received confirmation from the prosecutor that he would dismiss the charges. Yet Lopez was not released until November 7, five days later. Michigan authorities thus confined the wrong man for 24 days.

After his release, Benjamin Lopez brought this suit under 42 U.S.C. § 1983 against several of the officers and entities involved, including Foerster, Graham, and the Traverse Narcotics Team. Lopez eventually settled with all of the defendants except for Graham and the Team. He dismissed these defendants (including Foerster) from the suit. As for the remaining defendants, Lopez alleged that Graham violated the Fourth Amendment through his participation in Lopez's arrest

4

and detention. He also alleged that the Team violated the Fourth Amendment because of its failure to adequately supervise officers like Foerster.

The district court granted summary judgment to Graham and the Traverse Narcotics Team. The court held that Graham did not act recklessly in directing Foerster to get an arrest warrant for Lopez because he lacked any reason to believe that Foerster had identified the wrong person. *See Lopez v. Foerster*, 2020 WL 6816942, at \*3–4 (W.D. Mich. Nov. 20, 2020). It added that Graham had attempted to secure Lopez's timely release when he learned of the misidentification. *Id.* at \*4–5. The court next rejected Lopez's claim against the Team. It questioned the Team's capacity to be sued. *See Lopez v. Foerster*, 2020 WL 6882903, at \*3 (W.D. Mich. Nov. 24, 2020). But it ultimately held that the Team did not have a policy or custom that led to misidentifying suspects in violation of the Fourth Amendment. *See id.* at \*4–5.

Lopez now appeals. We review the district court's grant of summary judgment de novo. *Pineda v. Hamilton County*, 977 F.3d 483, 489 (6th Cir. 2020).

## II

We begin with Lopez's § 1983 claim against Graham. Section 1983 allows parties to seek damages from government officials who "subject[]" them "to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" 42 U.S.C. § 1983. Under this text, courts must first identify the relevant right (a constitutional question) and then identify § 1983's requirements to recover for a violation of this right (a statutory question). *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021).

Courts start by "'identify[ing] the specific constitutional right' at issue" because § 1983 does not itself create substantive rights; it provides a cause of action for rights found elsewhere. *Manuel v. City of Joliet*, 137 S. Ct. 911, 920 (2017) (citation omitted); *see Baker v. McCollan*,

443 U.S. 137, 140 (1979). In this case, Lopez asserts that the Fourth Amendment's ban on "unreasonable" "seizures" was violated when he was arrested and detained for 24 days based on the mistaken belief that he was the "Benny" Lopez who sold the heroin. U.S. Const. amend. IV. Other plaintiffs in similar mistaken-identity cases have also invoked the Due Process Clause. *See Baker*, 443 U.S. at 145; *Seales v. City of Detroit*, 959 F.3d 235, 240 (6th Cir. 2020). But the Supreme Court has recently held that courts should assess claims of unlawful pretrial detention under the Fourth Amendment. *See Manuel*, 137 S. Ct. at 919–20. And Lopez does not raise a distinct due-process claim anyway, so we need not consider this separate constitutional theory.

Under the Fourth Amendment, the government generally may not arrest or detain a person without probable cause to believe that the person has committed a crime. *See id.* That said, officers may occasionally end up arresting an innocent person on the reasonable (but mistaken) belief that this person is someone that they do have probable cause to arrest. *See Hill v. California*, 401 U.S. 797, 802–04 (1971). An arrest based on such a reasonable factual mistake does not violate the Fourth Amendment because the amendment bars only "unreasonable" seizures. *See id.* at 804–05; *Heien v. North Carolina*, 574 U.S. 54, 61 (2014); *see also, e.g.*, *Seales v. City of Detroit*, 724 F. App'x 356, 361–62 (6th Cir. 2018). If the factual mistake is unreasonable, however, the arrest may violate the Fourth Amendment. *See Ingram v. City of Columbus*, 185 F.3d 579, 596 (6th Cir. 1999). And even when the mistake is reasonable at the outset, an extended detention of a wrongly arrested person may become unreasonable if, say, the jailers receive new evidence showing the mistake. *See Meeks v. City of Detroit*, 727 F. App'x 171, 177–78 (6th Cir. 2018); *Mills v. Barnard*, 869 F.3d 473, 480–81 (6th Cir. 2017); *Webb v. United States*, 789 F.3d 647, 663 (6th Cir. 2015); *see also Baker*, 443 U.S. at 144 (relying on the Due Process Clause); *Gray v. Cuyahoga Cnty. Sheriff's Dep't*, 150 F.3d 579, 582–83 (6th Cir. 1998) (same).

After a court has identified the constitutional right, it next must identify the statutory "rules associated with" a damages action under § 1983 for the right's violation. *Dibrell*, 984 F.3d at 1160 (quoting *Manuel*, 137 S. Ct. at 920). In that respect, § 1983 does not permit a plaintiff to hold all state actors who are tangentially tied to a constitutional violation jointly liable for each other's conduct. Rather, the § 1983 plaintiff must adequately connect each defendant's *personal* actions to the violation. *See Pineda*, 977 F.3d at 490; *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). Because the statute "creates a species of tort liability," the Supreme Court has looked to the analogous common-law tort to decide what a plaintiff must prove to hold each defendant liable. *Dibrell*, 984 F.3d at 1159 (citation omitted); *see Manuel*, 137 S. Ct. at 920. When a plaintiff challenges an initial arrest, we have analogized to false-arrest claims. *See, e.g.*, *Tlapanco v. Elges*, 969 F.3d 638, 652–53 (6th Cir. 2020). When a plaintiff challenges a continued detention beyond a court's issuance of legal process, we have analogized to malicious-prosecution claims. *See, e.g.*, *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010); *see also Dibrell*, 984 F.3d at 1162–63.

In this case, the Grand Rapids officers seized Lopez pursuant to legal process (a judge-issued arrest warrant), so he relies on our malicious-prosecution precedent to establish his Fourth Amendment claim. We have repeatedly "called the malicious-prosecution label an 'unfortunate and confusing' 'misnomer'" in this context. *Lester v. Roberts*, 986 F.3d 599, 606 (6th Cir. 2021) (quoting *Sykes*, 625 F.3d at 310); *see also, e.g.*, *Howse v. Hodous*, 953 F.3d 402, 408–09 (6th Cir. 2020). Among other reasons, the Fourth Amendment generally turns on the objective reasonableness—not the subjective maliciousness—of a seizure. *See Lester*, 986 F.3d at 607. A case now pending at the Supreme Court, moreover, may clarify the rules for unreasonable-seizure claims like Lopez's. *See Thompson v. Clark*, 141 S. Ct. 1682 (2021). But both parties have asked us to apply our usual Fourth Amendment framework and neither has suggested that the issues

7

presented in *Thompson* could affect things here. Given the parties' litigating choices, we will apply that established framework.

To prove a Fourth Amendment malicious-prosecution claim under our caselaw, a plaintiff must show, among other elements, that a defendant "made, influenced, or participated" in the criminal prosecution and that the government lacked probable cause to initiate the prosecution. *Sykes*, 625 F.3d at 308 (citation and alterations omitted). For a police officer to "participate" in a prosecutor's decision to charge a suspect, our cases suggest that "the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 308 n.5; *see, e.g.*, *Johnson v. Moseley*, 790 F.3d 649, 654–55 (6th Cir. 2015); *Webb*, 789 F.3d at 660. To distinguish between affirmatively "aiding" the prosecution and "passively participating" in it, we have relied on an officer's "blameworthiness." *See Johnson*, 790 F.3d at 655; *see also Meeks*, 727 F. App'x at 178. If, for example, an officer made "deliberate or reckless falsehoods" to a judge in order to initiate the criminal proceedings, the plaintiff can pursue a Fourth Amendment malicious-prosecution claim against the officer. *Newman v. Township of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014) (citing *Sykes*, 625 F.3d at 312). If, by contrast, the officer's false statement rested on "negligence" or an "innocent mistake," the plaintiff cannot do so. *Johnson*, 790 F.3d at 655.

*Meeks* provides a good example of this standard. James Meeks was implicated in two carjackings at nearby gas stations. 727 F. App'x at 173. Officers wanted to include his picture in a photo array to see if witnesses would identify him as the carjacker. *Id.* at 173–74. Yet the officer tasked with creating this photo array accidentally used a photo of James Meekslittle—not Meeks— to show the witnesses. *Id.* When the witnesses identified the picture of Meekslittle as the culprit, the state charged Meeks on the mistaken belief that the witnesses had actually identified him. *Id.*

at 174–75. But the state dismissed the charges when it discovered this error, and Meeks brought a Fourth Amendment malicious-prosecution claim against the officers who participated in the carjacking investigation. *Id.* at 175. We affirmed the grant of summary judgment to all officers. *Id.* at 179–80. Of most relevance here, we rejected Meeks's claim against the supervising officer who had ordered the photo array, participated in the witness identifications, and approved of the request for an arrest warrant. *Id.* at 180. We found that this supervisor had been, at most, negligent in failing to catch the other officer's error, and thus Meeks could not establish that he acted with the required blameworthiness. *Id.*

Lopez's claim against Detective Graham in this case warrants the same result as *Meeks*. Lopez asserts that Graham participated in his "unreasonable" "seizure" in two ways—first by helping institute proceedings against him without probable cause and second by continuing to detain him after learning of his innocence. Yet Lopez cannot show that Graham acted with sufficient "blameworthiness" for either of these claims. *Johnson*, 790 F.3d at 655.

Start with Graham's conduct in instituting proceedings. He added a note to the Lopez casefile directing Foerster to conduct more controlled buys or request an arrest warrant. But Graham added this note on the belief that Foerster intended to arrest the "Benny" from the Traverse City area with whom Graham was familiar. Lopez identifies no evidence that could establish that Graham acted in deliberate or reckless disregard to the fact that Foerster planned to arrest Lopez instead. *See Newman*, 773 F.3d at 772. Graham did not participate in the investigation. He did not help execute the controlled buy, speak with the confidential informant, or seek the arrest warrant. He merely conducted a monthly review of the Lopez casefile. And nothing in that file would have put Graham on notice that Foerster identified the wrong Lopez. Foerster, for example, did not even include Lopez's Grand Rapids address in the file. All told, Graham had far less

9

involvement in the investigation in this case than the supervisor had in the investigation in *Meeks*. If the supervisor's conduct in that case could not suffice to withstand summary judgment, neither can Graham's conduct in this one. *See Meeks*, 727 F. App'x at 180.

Turn to Graham's actions upon discovering the misidentification. He told Foerster to contact the prosecutor "immediately" about the situation because he thought Lopez should be "released from jail as soon as possible." Graham Dep., R.95-1, PageID 625. So Foerster contacted the prosecutor on the same day. The next day, Graham followed up with the prosecutor to ensure that Foerster had contacted him and that the prosecutor intended to dismiss the charges. Although the prosecutor and court took five more days to release Lopez, no evidence suggests that we can place the blame for that delay on Graham. As Graham explained, "neither the detective nor supervisory people have the authority to release anyone from custody"; that relief depends on the prosecutor and the judge. *Id.*, PageID 620. Once Graham quickly relayed this information to the prosecutor, therefore, "[t]hat's when the rest of the criminal process took over." *Seales*, 959 F.3d at 240. Lopez identifies no caselaw suggesting that Graham should have done more.

In response, Lopez insists that he need only establish that Graham's conduct exhibited sufficient "blameworthiness," not that he affirmatively made any deliberate or reckless falsehoods to a judge. But he does not explain why Graham's actions were "blameworthy" other than to suggest that Graham should have known of the error because he should have engaged in a closer review of the casefile. We have already rejected this type of "should have known" argument. *See Johnson*, 790 F.3d at 656. Graham's conduct shows, at most, a "lack of attention to detail." *Newman*, 773 F.3d at 772. But that type of evidence falls short of the type of participation necessary for Lopez to establish his claim against Graham. *See id.*

10

This is not to say that no potentially culpable conduct occurred here. As Graham himself conceded, Foerster took "shortcuts" in his identification of the suspected drug dealer "Benny." Graham Dep., R.95-1, PageID 636. But § 1983 does not permit Lopez to hold Graham vicariously liable for any misconduct by Foerster. *See Pineda*, 977 F.3d at 490. And Lopez settled his claim against Foerster, so we need not consider whether Foerster's conduct rose to the required level of blameworthiness. All we must decide is that Graham's did not.

## III

Lopez's claim against the Traverse Narcotics Team fares no better. At the outset, it is not clear that Lopez can assert a § 1983 claim against this Team. Section 1983 permits a plaintiff to sue a "person." 42 U.S.C. § 1983. The Supreme Court has interpreted the word "person" to include local government bodies (like a county) but not state government bodies (like a state agency). *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 & n.55 (1978). Even for local governments, however, § 1983 does not change basic procedural rules permitting only "juridical" entities to sue and be sued. Whether a governmental body has a separate legal existence allowing it to be sued in its own name generally turns on the law of the state that established the body. *See* Fed. R. Civ. P. 17(b)(3)(A); 6A Charles A. Wright et al., *Federal Practice & Procedure* § 1562, at 618–19 (3d ed. 2010); *see, e.g.*, *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006). We thus have held that several different types of § 1983 defendants were not suable entities under the relevant state's law. Specifically, we have held that § 1983 plaintiffs could not sue a county's police department, *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994), a county's drug task force, *Mayers v. Williams*, 2017 WL 4857567, at *3 (6th Cir. Apr. 21, 2017) (order), and a city's law department, *Crutcher v. Ct. Psychiatric Clinic*, 2017 WL 5514812, at *2 (6th Cir. Apr. 28, 2017) (order).

The Traverse Narcotics Team argues that it too does not qualify as a legal entity. As the district court explained, however, the Team's legal status presents a closer question than the status of these other entities. *Lopez*, 2020 WL 6882903, at *3. On the one hand, the agreement creating the Team expressly notes it does not make the Team a separate legal entity. A 2014 amendment to the relevant state law also clarifies that "[i]f an interlocal agreement does not expressly provide for a separate legal entity, then a separate legal entity shall not be created." Act of March 20, 2014, 2014 Mich. Pub. Acts 158, 160 (codified as amended at Mich. Comp. Laws § 124.507(1)). On the other hand, this amendment postdates the agreement that created the Team, and the Michigan Supreme Court had previously held that entities created under this law generally could be sued. *See Manuel v. Gill*, 753 N.W.2d 48, 54–56 (Mich. 2008). Similarly, the Team's by-laws suggest that it may obtain property, and it has brought a civil-forfeiture suit in its own name in the past.

This case also raises tricky questions about whom the proper defendant would otherwise be. When a plaintiff sues, say, a non-juridical police department, the plaintiff often can easily fix this error by suing the city or county that operates the department. *See Matthews*, 35 F.3d at 1049. In this case, however, *both* the Michigan State Police Department *and* several local counties formed the Traverse Narcotics Team. So the Team officers involved in any given investigation could be state officers or county officers (or a mix of both). Lopez cannot sue the state police under § 1983, *see Will*, 491 U.S. at 71, and many of the suable local counties had no officers involved in this case. So what would be the appropriate entity to sue if not the Team? Given these many novel issues, we opt to follow the district court's path and avoid this question altogether. Even if Lopez could sue the Team under § 1983, his claim would still fail on the merits.

Although *Monell* allowed § 1983 plaintiffs to sue local governments, the Supreme Court made clear that plaintiffs could not hold these governments strictly liable for the wrongdoing of

their employees under the "respondeat superior" theory from the common law of torts. 436 U.S. at 691; *see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Instead, a § 1983 plaintiff may hold a local government liable only for that government's *own* unconstitutional "policy" or "custom" and only if this policy or custom caused the plaintiff's injury. *See Pineda*, 977 F.3d at 495. Sometimes a plaintiff will challenge a local government's official policy (such as an ordinance or another decision by its legislative body), so there can be no question that the plaintiff seeks relief against the local entity's policy or custom. *See Brown*, 520 U.S. at 405–06; *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Many times, however, the local entity's official policies will not have directly caused the injury; a lower-level employee will have done so. To sue the local entity in these circumstances, a plaintiff must somehow connect this injury back to one of the local entity's unofficial customs. The plaintiff might, for example, allege that the entity has a custom of failing to adequately *train* its employees. *See, e.g.*, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Gambrel v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022). Or a plaintiff might allege that the entity has a custom of failing to adequately investigate its employees' misconduct and thus of *acquiescing* in that conduct. *See, e.g.*, *Pineda*, 977 F.3d at 495. For theories like these, the Supreme Court has imposed "rigorous standards of culpability and causation" to ensure that they do not become easy workarounds to the ban on holding local entities strictly liable for their employees' misconduct. *Brown*, 520 U.S. at 405. Thus, a plaintiff must establish that the local entity acted with deliberate indifference to whether its own custom would lead to the type of constitutional injury that an employee eventually inflicted. *Id.* at 407, 411. And a plaintiff must establish that the local entity's deliberate indifference was the "'moving force' behind" that injury. *Id.* at 404; *see also Connick v. Thompson*, 563 U.S. 51, 59 (2011); *Gambrel*, 25 F.4th at 408–09.

In this case, Lopez argues that the Traverse Narcotics Team had a "custom" of failing to *supervise* its officers and that this custom caused Foerster to misidentify him as "Benny" Lopez. *See Jones v. Clark County*, 959 F.3d 748, 761–62 (6th Cir. 2020) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)); *Pecsi v. City of Niles*, 674 F. App'x 544, 547 (6th Cir. 2017). We have called this failure-to-supervise theory a "rare" "specimen" that sits somewhere between the claim that a municipality had a policy of failing to train its employees and the claim that it had a policy of acquiescing in their misconduct. *Mize v. Tedford*, 375 F. App'x 497, 500 (6th Cir. 2010). No matter the label, the claim requires Lopez to show more than simply that the Team's supervision of Foerster was inadequate. *See Ellis*, 455 F.3d at 700. Lopez must also meet the Supreme Court's deliberate-indifference and causation standards to ensure that we do not hold the Traverse Narcotics Team automatically liable for the actions of its team members. *Id.*; *see also Connick*, 563 U.S. at 59.

We can resolve this appeal solely on the deliberate-indifference element. That element asks whether the alleged constitutional violation "was a 'known or obvious consequence'" of the inadequate supervision of the employee who committed the violation. *Gambrel*, 25 F.4th at 408 (quoting *Connick*, 563 U.S. at 61). This test typically requires proof of a "pattern of similar constitutional violations" to the one that the plaintiff alleges in the case at hand. *Connick*, 563 U.S. at 62; *see Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *Marcilis v. Township of Redford*, 693 F.3d 589, 605 (6th Cir. 2012). If a municipality's decisionmakers lack notice that their supervision has led to constitutional violations in the past, the Supreme Court has reasoned, it will be difficult to establish that they should have known of the risk. *See Connick*, 563 U.S. at 62. The Court has, however, left open the possibility that a plaintiff could establish deliberate indifference based on a single incident alone if it should have been obvious to the municipality

14

that the lack of supervision would lead to the constitutional violation. *Connick*, 563 U.S. at 63 (citation omitted); *see also Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020).

Lopez does not attempt to rely on this single-incident theory. We thus need only consider whether he has established a sufficient "pattern" of conduct like Foerster's misidentification of him in this case. *Connick*, 563 U.S. at 62. He has fallen short in that regard. The record contains no evidence that officers on the Traverse Narcotics Team ever previously undertook slipshod investigations to identify suspected drug dealers. Lopez, for example, points to no other case in which an officer relied only on the statewide law-enforcement database to identify a suspect without seeking to corroborate the information found there. Indeed, Lopez cites several Team policies (such as the use of audio surveillance during controlled buys and the search of suspects on the Team's internal database) that are seemingly designed to reduce the risk that its officers will identify the wrong person. Although Lopez claims that Foerster did not follow these policies, this one failure alone does not show a pattern. Without identifying a "history of abuse," Lopez cannot establish that the Team's supervision protocols deliberately disregarded the risk that Foerster would misidentify him. *Marcilis*, 693 F.3d at 605.

To be sure, Lopez points to one other incident from "years before" in which a different officer on the Team caused the police to arrest the wrong person. Appellant's Br. 34. Yet one prior incident does not prove a "pattern." *Cf. Meeks*, 727 F. App'x at 181–82; *Thomas*, 398 F.3d at 433–34. Regardless, this prior incident was "not similar to" the alleged constitutional violation in this case. *Connick*, 563 U.S. at 63. There, a different officer mis-entered a suspect's birth date on a warrant request. *Cf. Berry v. Del. Cnty. Sheriff's Off.*, 796 F. App'x 857, 862–63 (6th Cir. 2019). Nothing indicates that this typo resulted from inadequate supervision. To require a local

entity's policymakers to micromanage their employees down to cite checking every warrant application would leave them with little time to do anything else.  *See Pecsi*, 674 F. App'x at 547.

We affirm.